**PAUL ROCHESTER INVESTMENT CO., Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. CA 3–84–0867–G.**

United States District Court, N.D. Texas, Dallas Division.

June 7, 1988.

W. Edward Walts, II, Strasberger & Price, Dallas, Tex., for plaintiff.

Grover Hartt, III, Tax Div., Dept. of Justice, Dallas, Tex., Robert F. Bentley, Scottsdale, Ariz., for defendants.

## MEMORANDUM ORDER

FISH, District Judge.

This case is before the court on cross motions for summary judgment. The parties have agreed that all of the facts necessary to dispose of this case are undisputed.[1]

After reviewing the motions and briefs of all parties, the court concludes that as a matter of law, there being no genuine issue for trial, the United States is entitled to judgment against plaintiff Paul Rochester Investment Co. ("Rochester") and Rochester is entitled to judgment against defendant C & A Development Co. ("C & A Development").

### I. Background

#### A. *Nature of the Case*

This is a dispute over title to a 118–acre tract of land in Lubbock County, Texas ("the property").[2] Rochester purchased the property on November 1, 1983 from C & A Development. Rochester seeks to quiet its title against the United States' claim that it has a prior and valid tax lien against the property. In the alternative, Rochester seeks relief against C & A Development for breach of warranty. The United States seeks enforcement of its tax lien.

---

**1.** *See* Joint Motion to Extend Discovery and Set Date to Submit Case on Summary Judgment, filed August 30, 1985, and Response to Order of August 6, 1987, filed August 24, 1987.

**2.** The property was part of an original tract of approximately 167 acres. Deposition of Frank S. Campbell ("F. Campbell dep.") at 26. This original 167–acre tract was sold to Rochester in two parcels. Rochester bought the first parcel, consisting of 41.330 acres, for $3,005,818 in July, 1983. It then bought the second parcel, the 118.394 acres at issue here, for $2,500,000 in November, 1983 (the remaining acreage out of the original tract apparently being conveyed to the city of Lubbock for street improvements).

Because only the second parcel is in controversy here, the 118.394 acres involved in that transaction will be referred to as "the property." To minimize confusion, the entire original 167–acre tract will be referred to as the "Quaker Mall property."

### B. Purchase of the Quaker Mall Property.

On March 27, 1979, a Declaration of Trust naming Frank S. Campbell ("the taxpayer")[3] as "Trustee" was executed by the taxpayer, two of his sons (F. Richard Campbell and Robert A. Campbell), one of his sons-in-law (Gary D. Jones), and the attorney for the various Campbell entities (Robert F. Bentley). The taxpayer signed as trustee and as an individual beneficiary.[4]

The stated purpose of the Trust was to hold the Quaker Mall property, which had been purchased for more than two million dollars (F. Campbell dep. at 30), on behalf of the beneficiaries and a partnership to be formed—the Quaker Mall Partnership.

### C. The Quaker Mall Partnership.

Although the Quaker Mall property was purchased in March 1979, the Quaker Mall Partnership was not actually established until January 2, 1980. The "Agreement of Partnership" reflected, in Exhibit A thereof, that each of the beneficiaries of the Trust, including the corporation, had a corresponding share in the partnership, i.e., 15 percent each for the five individuals, 25 percent for the corporation. *See* Appendix B in Support of the Motion for Summary Judgment of the United States ("Appendix B"). Although the Partnership Agreement was filed in the deed records of Lubbock County, Texas, record title to the property

remained in the Trustee until shortly before it was sold in 1983. *See* Appendix E.

### D. Financing the Purchase.

To finance the purchase of the Quaker Mall property, the Trust obtained a series of loans from the Fort Worth National Bank, which later became known as the Texas American Bank/Fort Worth, N.A. (McDonald dep. at 9). The bank made a total of four loans to the Trust, each in the amount of $600,000 and each secured by a portion of the Quaker Mall property. The first two were paid off before the third was made in July, 1981 (McDonald dep. at 16, 41–43). This third loan, as well as a fourth made in June, 1982, were paid in July, 1983 when the 42-acre parcel was sold to Rochester (McDonald dep. at 37–38, 45).

### E. The $1,000,000 Loan.

In addition to these four loans, another loan in the amount of one million dollars was made to the Trust in February, 1982. Although this money was borrowed by the Trust, it was actually used by another of the Campbell family entities,[5] C & A Camelback Equities, to build some time-share condominiums in Arizona (McDonald dep. at 55, lines 1–10). This note, its several extensions, and a deed of trust dated September 21, 1983 were recorded in the deed records of Lubbock County (McDonald dep. ex. 12).[6]

---

**3.** The unpaid taxes which are involved in this case are income taxes owed by Frank S. and Lula H. Campbell. Mrs. Campbell, however, did not play a role in these events and, for this reason, references to "the taxpayer" will be to Frank S. Campbell.

**4.** F. Campbell dep. at 34 and F. Campbell dep. ex. 1.

**5.** The Campbells owned and operated a number of business entities. The taxpayer was president of C & A Companies, Inc., which owned and operated the following subsidiaries:

C & A Development Co., Inc. (a defendant herein)
C & A Realty Co., Inc.
C & A Investment Co.
United Phoenix Companies
C & A Manufacturing Co.
(F. Campbell dep. at 11–17).

Besides these companies, the Campbells operated several partnerships:

Quaker Mall Partnership (described above)
C & A Camelback Equities (described above and in F. Campbell dep. at 15; *see also* C & A's Answer to Interrogatory No. 2, at 4–5, in Appendices in Support of Rochester's Motion for Summary Judgment)
Permian Mall Partnership (apparently, according to the McDonald deposition, a partnership)
South Plains Mall Partnership (F. Campbell dep. at 30)

Beginning in 1985, the Campbells appear to have begun conducting their business affairs through another corporation, Design Construction, Inc. (F. Campbell dep. at 18–21; Robert Campbell dep. at 16–19).

**6.** This note was originally secured by the July 1981 deed of trust given in connection with the third $600,000 note. Later the September 1983 deed of trust was executed to secure this loan (McDonald dep. at 57).

### F. The Permaloy Loan.

Yet another Campbell enterprise was Permaloy Corporation, a publicly-traded Utah corporation in which the Campbells own controlling interest (49.99 percent) (F. Campbell dep. at 22–23). Permaloy never owned an interest in the Quaker Mall property (*Id.* at 51). In January 1982, however, it did receive a $1,500,000 loan from the Texas American Bank, which was secured in part by a deed of trust on the Quaker Mall property. This loan was also secured by a $750,000 certificate of deposit belonging to the taxpayer; Permaloy's receivables; guaranties from various Campbells and C & A Companies; and by a deed of trust on the Quaker Mall property (McDonald dep. at 24–27).

After the July sale of part of the Quaker Mall property, $700,000 of the proceeds were applied to the principal of the Permaloy loan (McDonald dep. at 37–38). Ultimately, the $750,000 certificate of deposit was also applied, and the remaining $50,000 was rolled over into a loan to the taxpayer individually (McDonald dep. at 35). In between these two events, $33,349.64 of proceeds from the November sale of the property was applied to interest due on this note (McDonald dep. at 33 and McDonald dep. ex. 7).

Apparently, the deed of trust was to have been executed by Frank S. Campbell as *trustee of the trust* which owned the Quaker Mall property. Nevertheless, the deed of trust was actually executed by Frank S. Campbell, Trustee—Permaloy Corporation, Robert F. Bentley, Secretary—Permaloy Corporation, and Frank S. Campbell, President—Permaloy Corporation (McDonald dep. at 83–86 and F. Campbell dep. at 97–99).

### G. Sale of the Property to Rochester.

As mentioned previously, the Quaker Mall property was sold to Rochester in two parcels. Both transactions were structured in the same manner: the Quaker Mall Partnership executed a quitclaim deed to Frank S. Campbell, Trustee, who in turn executed a warranty deed to C & A Development, which finally made the conveyance to Rochester (Brandt dep. at 17–20, 53, 63; F. Campbell dep. at 42; Appendix E).

### H. The Tax Lien.

Between the dates of these two sales, the tax lien involved in this suit was duly filed in Lubbock County on September 30, 1983. Appendix F. It secured the assessment against Frank S. and Lula H. Campbell for 1982 income taxes, penalty, and interest in the amount of $1,044,455.85.[7]

### I. The Bank's Distribution of the November Sale Proceeds.

After the sale of the property in November, the bank received proceeds of $1,704,615.88. Of this total, $1,111,443.69 (representing principal of $1,000,000 and interest of $111,443.69) was applied to pay off the remaining debt of Frank S. Campbell, Trustee, i.e., the $1,000,000 loan (McDonald dep. at 31, lines 9–25, and McDonald dep. ex. 7). Additionally, $37,812.46 was applied to interest on a Frank S. Campbell personal loan in the principal amount of $500,000. Although not secured by a deed of trust, the bank had a "question" whether this debt, owed by the taxpayer individually, might be secured by the "Mother Hubbard clause" of its deeds of trust signed by Frank S. Campbell, Trustee (McDonald dep. at 32, 33).[8]

As mentioned earlier, $33,349.64 was applied to interest on the Permaloy loan. In addition, a total of $510,154.17 was applied to two loans the bank made to the Campbells for the Permian Mall in Odessa, Texas. The bank has never contended that

---

7. This amount resulted from a self-assessment, i.e., the amount reported by the taxpayers, not a deficiency assessed after an audit (F. Campbell dep. at 8–9).

8. Apparently another $500,000 loan to Frank S. Campbell, Trustee, was made in September 1981 and repaid before February 1982. This is a different $500,000 loan from the personal one on which interest was paid. The personal loan was only secured by a $250,000 certificate of deposit (McDonald dep. at 46–48). Evidently this personal loan was used to provide working capital for some of the Campbell entities (McDonald dep. at 21–22).

these loans were in any way secured by the Quaker Mall property, even by means of its "Mother Hubbard clause" (McDonald dep. at 33–35, 65 lines 21–23, and 76 lines 8–11).

### J. The Title Company Learns of the Tax Lien.

Both sales to Rochester of the Quaker Mall property were closed by Western Title Co. of Lubbock, Texas ("Western"). Western first became aware of the tax lien on October 24, 1983, i.e., before the November sale (Brandt dep. at 15, lines 7–17). As the issuer of the title insurance policy in its capacity as agent of the title insurance company, Western Title was understandably concerned about its exposure because of the tax lien. After discussion, it was decided by Western and the Campbell interests to withhold $91,329.80 for the tax lien (Brandt dep. at 42–45). As a further precaution, Western obtained an indemnity agreement from C & A Development (Brandt dep. at 57–58 and Brandt dep. ex. 10).

### K. The Title Company's Payment to the Bank.

With regard to the funds due the bank, the title company received the $1,704,-615.88 figure referred to above from Ms. McDonald, via a telephone call which was confirmed by letter (Brandt dep. at 36–38 and Brandt dep. ex. 7). As Mr. Brandt explained, an extra day's interest ($977.78) was added to the amount shown on the letter (Brandt dep. at 37). This total amount was apparently decided upon by Ms. McDonald and one of the taxpayer's sons, Robert A. Campbell (McDonald dep. at 75). Since the title company had found deeds of trust amounts in excess of the figure requested by the bank, it evidently made no further inquiry into the constituent elements of the total figure related by Ms. McDonald (Brandt dep. at 39).

### L. The Internal Revenue Service Investigation of the Extent of Its Interest.

The Internal Revenue Service ("IRS") undertook an investigation to determine what amount of the proceeds it was enti-tled to receive in satisfaction of its lien. This investigation began when the IRS received a hand-delivered letter from the Campbells on November 1, 1983 (the date of the sale) seeking to have the property discharged from the lien (Williams dep. at 4, 15–16). At the time of closing, the IRS, which had no prior information about the sale, advised that if the facts proved to be as represented, the $91,329.80 withheld from the proceeds would be accepted in satisfaction of its lien interest (Brandt dep. at 66–67). During the next few months, the IRS attempted to investigate the transactions described above. By February 1984, it had concluded that its interest was greater than the amount withheld at the closing and therefore advised the parties of its intent to seize the property (Brandt dep. at 48–51; Brandt dep. ex. 9).

### II. Analysis

The United States is entitled to a lien for unpaid taxes against "all property and rights to property" of the taxpayer. 26 U.S.C. § 6321. This lien includes not only the unpaid tax itself, but also "any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto." *Id.* By virtue of Section 6322, this lien arises on the date of assessment.

26 U.S.C. § 6323 establishes the method for perfecting this lien against third parties and a regime of lien priorities. During the period between assessment and filing of a notice of federal tax lien in accordance with Section 6323(f), the lien is sometimes referred to as a "secret lien" because its existence is known only to the IRS and the taxpayer. After filing of the notice, the priority of the lien vis-a-vis other creditors is determined by resort to Section 6323.

■ Unlike liens which perfect security interests in specific items of property, the federal tax lien is a general lien attaching to all property and rights to property of the taxpayer. As the Supreme Court observed in *United States v. National Bank of Commerce*, 472 U.S. 713, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985), the language of Section 6321 "is broad and reveals on its face that Congress meant to reach every

interest in property that a taxpayer might have." *Accord, Glass City Bank v. United States,* 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945) ("[s]tronger language could hardly have been selected to reveal a purpose to assure the collection of taxes").

■ The nature and extent of the taxpayer's property interests have traditionally been recognized as matters to be determined by State law. *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960); *United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135 (1958). Nevertheless, the Fifth Circuit has held that any interest in property at all, no matter how extensive under State law, is sufficient for the tax lien to attach. *Broday v. United States,* 455 F.2d 1097, 1101 (5th Cir.1972). Once it is determined that State law recognizes that the taxpayer has an interest in the property, the federal tax lien will attach to that interest no matter how limited or restricted the taxpayer's rights with respect to the property may be as a matter of State law. *United States v. Mitchell,* 403 U.S. 190, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971).

> However, once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's "property" or "rights to property."

*Aquilino,* above, 363 U.S. at 513–514, 80 S.Ct. at 1280.

In the present case, it is undisputed that the Trust held legal title to the property when the tax lien was filed on September 30, 1983. *See* paragraphs I(B), (C), and (G), above. It was not until October 4, 1983 that the Quaker Mall Partnership quitclaimed whatever interest it had in the property to the Trust and the Trust in turn conveyed the property to C & A Development for eventual conveyance to Rochester.[9]

The November sale to Rochester produced a gross amount due the seller of $2,501,-522.39. *See* Seller's Statement ("Seller's Statement") in Appendix E. Of course, various charges were deducted from this gross amount until a "net amount" due to seller was produced.

Realizing that the United States would be entitled to 15 percent of the net proceeds, the parties first calculated an amount of $76,329.00 to satisfy the tax lien, *viz:*

| Net Proceeds | | 508,865.31 |
|---|---|---|
| Taxpayer's interest | × | .15 |
| Amount to be withheld | | 76,329.80 |

Brandt dep. at 42–43.

This $76,329.80 was subtracted from the $508,865.31 figure to produce a figure of $432,535.51 as the "net amount due to seller." The $508,865.31 was the amount left after paying all of the amounts on the Seller's Statement between the gross and net figures except for the tax lien (Brandt dep. at 42). At the closing, however, the parties realized that the $100,000 payment to the United Bank of Arizona was subordinate to the tax lien. Therefore, they added another $15,000 (15 percent of $100,-000) to the amount withheld for the tax lien. The effect of this change was to acknowledge that the lien attached to $608,865.31, *viz:*

| Original Net | | 508,865.31 |
|---|---|---|
| Amount paid to United Bank of Arizona | | 100,000.00 |
| | | 608,865.31 |
| Taxpayer's interest | × | .15 |
| Amount withheld | | 91,329.80 |

The $417,535.51 net to seller figure shown on the Seller's Statement is obtained by subtracting full payment to the United Bank of Arizona ($100,000) and the money withheld for the tax lien ($91,329.80) from $608,865.31 (Brandt dep. at 43–44).

The $91,329.80 which the Campbells and the title company agreed to withhold was subsequently paid to the United States and

---

**9.** Because it is undisputed that the taxpayer had a 15 percent interest in the Trust as an individual beneficiary and a 15 percent interest in the Quaker Mall Partnership, it is unnecessary to decide whether the lien attached to the taxpayer's interest in the Trust or in the Partnership.

applied to the taxpayer's assessment.[10] The United States now challenges only one of the amounts paid ahead of its tax lien: the $1,704,615.88 paid to the Texas American Bank. The other items, such as the real estate commission, paving lien, etc., are not disputed. Not all of the amount paid to the bank is challenged—only that portion not secured by the property. The United States contends that because an excessive amount was paid to the bank, the amount from which the taxpayer's 15 percent was determined was too small.

The McDonald letter of November 2, 1983 (Appendix G) advised the Campbells how the money received by the bank from the closing was applied. According to Ms. McDonald, the $1,704,615.88 paid to the bank was applied in the following manner:

| LOAN STYLE | NOTE NO. | | AMOUNT |
|---|---|---|---|
| Frank Campbell, Trustee | # 6 | Prin. Int. | $1,000,000.00 111,443.69 |
| Frank S. Campbell | # 1 | Int. | $ 37,812.46 |
| Permaloy Corporation | # 1 | Int. | 33,349.64 |
| Permian Mall | # 2 | Prin. Int. | $ 488,148.36 11,009.88 |
| Permian Mall | # 3 | Int. | 10,995.93 |
| | | TOTAL | $1,692,759.96 |
| | | Difference (deposited into # 1–05999) | 11,855.92 |

When the property was sold in November 1983, all of the loans to the Trust to finance the purchase of the Quaker Mall property had been repaid. It appears that as a result of conversations between the Campbells and the bank (see, *e.g.*, McDonald dep. at 33–34, 73, and 75), an attempt was made to pay amounts on other indebtedness owed by various other Campbell interests. The United States maintains that only the first item in the McDonald letter (the $1,111,443.69 principal and interest for the Frank Campbell, Trustee, Note No. 6) was properly secured by the property and that the remaining payments to the bank should not have been made until after

calculation and payment of the amount due on the tax lien.

### A. The $1,000,000 Loan

The payment of $1,111,443.69 to the bank paid off the $1,000,000 loan described in paragraph I(E) above. Although it appears that the proceeds from this loan were used to finance the Campbell's time-share condominium project in Arizona, the United States does not dispute that the loan was properly secured by the Quaker Mall property.

Initially, no new deed of trust was executed when this loan was made. Instead, the note executed on February 26, 1982 referred to the July 1981 deed of trust, which had been executed to secure the third $600,000 note. *See* note 6, above. Most of the acreage described in this deed of trust was sold to Rochester in the July sale. The bank, apparently concerned about its collateral position, obtained a new deed of trust which covered the remaining acreage. This deed of trust recites that it is "an addition to and not to the exclusion of" the July 1981 deed of trust and a deed of trust executed in June 1982 to secure the fourth $600,000 note (McDonald dep. ex. 12). This final deed of trust was executed on September 21, 1983 but not filed until October 11, 1983, i.e., after the tax lien was recorded on September 30, 1983.

Since the July 1981 deed of trust did not describe much of the property and the October 1983 deed of trust was junior to the tax lien, the critical item is the June 1982 deed of trust (F. Campbell dep. ex. 28). It did not mention the $1,000,000 note. Like all of the other deeds of trust executed by Frank S. Campbell, Trustee (all of which are exhibits to the Frank S. Campbell deposition), it did contain a provision referred to by Ms. McDonald as a "Mother Hubbard clause." This provision, which is usually denominated a "dragnet clause," [11] is found

---

**10.** As a result of this and other credits, the amount owed by the taxpayer for 1982 was reduced to $313,465.87 as of October 1, 1985. The affidavit of Revenue Officer Douglas G. Gray (*see* Appendix I) explains the components of this total amount.

**11.** Actually the term "Mother Hubbard clause" is more commonly used to describe a standard provision in oil and gas leases which cover minor defects in the property description. *See, e.g.,* 42 Tex.Jur.2d, Oil & Gas, § 65 (1963). The provision relied upon by the bank is more frequently termed a "dragnet clause." Occasional-

in Section 1.2(C) of each of these deeds of trust.

1.2 The term "Obligations" means:

\* \* \* \* \* \*

C. All other indebtedness and liabilities of all kinds of Mortgagor to Bank now existing or hereafter arising, whether fixed or contingent, joint and/or several, direct or indirect, primary or secondary, and regardless of how created or evidenced ...

\* \* \* \* \* \*

This provision in the June 1982 deed of trust would have included the February 1982 loan of $1,000,000 to the Trust. Although the extent to which dragnet clauses will be enforced seems to vary, Texas courts are among those which will give them effect. *See, e.g., Moss v. Hipp,* 387 S.W.2d 656 (Tex.1965). The Eleventh Circuit has stated that dragnet clauses are "generally disfavored and are narrowly construed." *Uransky v. First Federal Savings & Loan Ass'n,* 684 F.2d 750, 756 n. 5 (11th Cir.1982). *Uransky* applied Florida law, but the Court noted that Texas law was "analogous." 684 F.2d 755. Nevertheless, the United States does not attack the payment of the principal and interest on the $1,000,000 loan.

### B. The Frank S. Campbell Personal Loan

■ As explained in paragraph I(I) above, the bank also applied $37,812.46 to interest due on a separate loan it had made to Frank S. Campbell individually. This loan was secured by a $200,000 certificate of deposit. Ms. McDonald was equivocal about the uses to which the Campbells put the money loaned to them. (McDonald dep. at 21, lines 9–19.) What is unequivocal, however, is that this loan was not secured by a deed of trust on the Quaker Mall property. (*Id.* at 32, lines 5–7.) According to Ms. McDonald, the bank did have a "question" as to whether the dragnet clause in the Quaker Mall deeds of trust might cover this loan. (*Id.* at 32, lines

11–16). Nevertheless, this question was never "researched" (*Id.* at 32, line 24), nor did the bank's attorneys ever conduct an "investigation." (*Id.* at 33, lines 6–10).

This expansive reliance on the dragnet clause is at odds with the narrow construction given such clauses. Recently the requirements for enforcing a dragnet clause in Texas were summarized in *In re Stone,* 49 B.R. 25 (Bkrtcy N.D. Texas 1985). Among them was the requirement that the "subsequent indebtedness must arise directly out of transactions between the parties to the mortgage." *Id.* at 27. Moreover, the "subsequent indebtedness must be of the same class or character as the first indebtedness." *Id.* These criteria from *Stone* were condensed from a more extensive consideration in *Kimbell Foods, Inc. v. Republic National Bank,* 557 F.2d 491, 494–497 (5th Cir.1977), *aff'd,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).

Also germane is *Airline Commerce Bank v. Commercial Credit Corporation,* 531 S.W.2d 171 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.). In that case, the bank foreclosed on a deed of trust. Besides paying the debt secured by that deed of trust, the bank also claimed that excess proceeds from the foreclosure could be applied to a partnership debt because its debtors on the foreclosed note were also partners in the partnership. The United States, a tax lien claimant in state court, countered that while the bank had priority on its deed of trust, its attempt to use a dragnet clause to apply the excess proceeds to the partnership debt was not justified. As in the present case, the bank had maintained separate records for these loans. The bank's expansive interpretation of its dragnet clause was rejected. 531 S.W.2d at 175.

In the instant case, the parties to the deed of trust were the bank and the Trust, of which the taxpayer was trustee. The Campbells were always careful to adhere to the formalities of this trust designation.

---

ly, cases refer to a subset of dragnet clauses called "future advances clauses." *Uransky v. First Federal Savings & Loan Ass'n,* 684 F.2d 750,

756, n. 5 (11th Cir.1982). The broader dragnet clause includes prior as well as later loans.

Ms. McDonald's suggestion that "Frank S. Campbell, Trustee" equates to "Frank S. Campbell, individually" (McDonald dep. at 19) is mistaken. Therefore, the *Stone* requirement that the transactions be between the same parties was not satisfied. Nor was the indebtedness of the trust and the taxpayer individually of the same class or character. The amount paid on this loan, therefore, was inferior to the tax lien.

### C. The Permaloy Loan

The details of the bank's loan to Permaloy are provided in paragraph I(F) above. Unlike the other Campbell corporations, Permaloy was a publicly traded corporation in which the Campbells purchased the controlling interest and installed themselves as officers. Like many of the other Campbell entities, Permaloy obtained a loan from the Texas American Bank. This loan for $1,500,000 was secured by a certificate of deposit for $750,000 in the name of the taxpayer; Permaloy's receivables; guaranties from C & A Companies (the parent corporation of C & A Development) and various other Campbell entities; and a deed of trust. After the July sale, $700,-000 was applied to the loan's principal. After the November sale, $33,349.64 was applied to interest.

The United States argues that this interest payment did not have priority over the tax lien. The deed of trust (Appendix D) was filed before the tax lien and does describe a portion of the Quaker Mall property. Nevertheless, the deed of trust was executed by Permaloy. This corporation never owned an interest in the property. (F. Campbell dep. at 51.) Apparently, the Campbells may have intended to pledge the Quaker Mall property on behalf of the Trust. *See* F. Campbell dep. at 97–99 and McDonald dep. at 83–86. Whatever their subjective intentions may have been, however, the documents actually executed were by Permaloy Corporation and by Frank S. Campbell, "Trustee of Permaloy Corporation," with corresponding acknowledgements. Page one of the deed of trust identifies Permaloy as the borrower instead of the mortgagor, but the Trust which owned Quaker Mall appears nowhere in the instrument.

"[I]t is almost black letter law that the federal government ... must depend upon record title of property for the satisfaction of its lien." *United States v. Truss Tite, Inc.*, 285 F.Supp. 88, 92 (S.D.Tex.1968). The Fifth Circuit has held that the United States is entitled to the protection of the Texas recording statutes. *United States v. Creamer Industries, Inc.*, 349 F.2d 625, 628 (5th Cir.), *cert. denied*, 382 U.S. 957, 86 S.Ct. 434, 15 L.Ed.2d 361 (1965). *See also Prewitt v. United States*, 792 F.2d 1353, 1355 (5th Cir.1986). *Creamer Industries* also held that the rights between the parties to a transaction may differ from those of third-party creditors and the taxpayer. 349 F.2d at 628. Moreover, it is of no moment that the failure to record properly did not mislead the United States and that the United States would not have acted differently if the lien in question had been recorded. *Truss Tite*, above, 285 F.Supp. at 91–92.

The situation with respect to the Permaloy loan also brings into play the doctrine of choateness. In essence, this doctrine requires a state law lien to be "choate" as well as prior in time before it will be accorded priority to the tax lien.[12] *See, e.g., Truss Tite* above, 285 F.Supp. at 91. A state-created lien is not choate until the identity of the lienor, the property subject to the lien, and the amount of the lien are established. *Kimbell Foods*, above, 440 U.S. at 721, 99 S.Ct. at 1455. "Failure to meet any one of these conditions forecloses priority over the federal lien, even if under

---

12. The Fifth Circuit has discussed choateness on a number of occasions. *See, e.g., Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040, 1050–1052 (5th Cir.1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973), and *Rice Investment Company v. United States*, 625 F.2d 565, 568–69 (5th Cir.1980). In *Southern Rock, Inc. v. B & B Auto Supply*, 711 F.2d 683 (5th Cir.1983), the Court held that choateness has been supplanted by Section 6323 to the extent that the statute "provides an unambiguous federal law answer." 711 F.2d 689. In the instant case, the problem under consideration is not even addressed by Section 6323, much less answered unambiguously. Therefore, the doctrine of choateness is fully applicable.

state law the non-federal lien was enforceable for all purposes when the federal lien arose." *Id.*

In the instant case, the identity of the lienor was not established. Although the Campbells and the bank may have intended for the Trust which owned the property to be the lienor, no such intention was reflected in the documents. Because the Permaloy loan was not secured by a deed of trust executed by the owner of the Quaker Mall property, it is subordinate to the federal tax lien.

### D. The Permian Mall Loans

■ The details of the transaction involving Permian Mall in Odessa are not included in the record, but there is no indication that the partnership or entity which owned Permian Mall ever owned any interest in the Quaker Mall property. When asked why payments were made to the loans from Quaker Mall proceeds, the banker responded:

> Q: Now, what was the basis for applying Quaker Mall funds to those two loans?
> A: I don't really know how to answer your question. It was some verbal agreements with the Campbells.

(McDonald dep. at 33, lines 20–23.) The bank does not suggest that any dragnet clause is applicable here. (McDonald dep. at 76, lines 8–11.) Only the oral arrangements between the bank and the Campbells are offered as a justification.[13]

### E. The $11,855.92 "Difference"

The final amount contained in the money paid to the bank is the $11,855.92 which was left over after all the other payments had been made. Unable to find any more loans to which this money could be applied,

the bank simply credited the Campbells with it (McDonald dep. at 82). The lien obviously attached to this amount.

### F. The amount due to the United States

The amount challenged by the United States is shown below:

| | |
|---|---:|
| Total Paid to Bank | $1,704,615.88 |
| Less amount secured by Quaker Mall property (the $1,000,000 loan plus interest) | − 1,111,443.69 |
| Amount challenged by United States | $ 593,172.19 |

Using this figure, the amount due to the United States can be calculated as follows, *viz:*

| | | |
|---|---|---:|
| Amount used to calculate $91,329.80 already paid to United States (see p. 12 above) | | $ 608,865.31 |
| Additional amount to which the lien attached (i.e., the unsecured payment to the bank) | + | 593,172.19 |
| TOTAL | | $1,202,037.50 |
| Taxpayer's interest (15 percent) | × | .15 |
| Amount due United States | | $ 180,305.63 |
| Less amount already paid | − | 91,329.80 |
| Balance due United States | | 88,975.83 |

Therefore, the United States should be awarded the remaining money it was entitled to on November 1, 1983: $88,975.83, plus interest after that date.[14]

### III. Conclusion

Because the United States is entitled to judgment against Rochester for $88,975.83 (plus interest from November 1, 1983 to date of payment), its motion for summary judgment is GRANTED. Rochester's motion for summary judgment against the United States is DENIED, but its alternative prayer for relief against defendant C & A Development is GRANTED.[15]

---

13. "They [the Campbells] were saying, 'This money is available, how much do you want?'" (McDonald dep. at 73, lines 23–24.)

14. Since the lien provided by 26 U.S.C. § 6321 also provides for interest, an additional amount calculated pursuant to the rates provided by Section 6621 should be determined for the period from November 1, 1983 until the date of payment.

15. Rochester seeks relief against C & A Development for breach of the warranty of title given when the property was conveyed. C & A Development has not briefed the summary judgment motions, but it is obvious, based upon the court's conclusion herein, that Rochester did not receive good title, i.e., title unencumbered by the tax lien of the United States, to the property. C & A Development therefore breached its warranty of title.

The parties are directed to submit, within twenty days of this date, a proposed form of judgment consistent with this memorandum order. If agreement cannot be reached, each party may submit its own version.

SO ORDERED.