INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA–AIRLINE DIVISION AND TEAMSTERS LOCAL 19, Plaintiffs–Appellees,

v.

SOUTHWEST AIRLINES COMPANY, Defendant–Appellant.

No. 87–1085.

United States Court of Appeals, Fifth Circuit.

June 22, 1989.

J. Joe Harris, San Antonio, Tex., for defendant-appellant.

James L. Hicks, Jr., Hal K. Gillespie, Dallas, Tex., Wilma B. Liebman, Washington, D.C., for plaintiffs-appellees.

Before CLARK, Chief Judge,
GOLDBERG, GEE, RUBIN, REAVLEY,
POLITZ, KING, JOHNSON,
WILLIAMS, GARWOOD, JOLLY,
HIGGINBOTHAM, DAVIS, JONES,
SMITH and DUHE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case presents the question whether the union's objection to the unilateral imposition of a comprehensive, mandatory drug testing program constitutes a "major" dispute under the Railway Labor Act that must be negotiated with the union before it can be implemented by Southwest Airlines, or whether the drug testing program was arguably justified by the existing collective bargaining agreement and hence was a "minor" dispute that must be arbitrated.

### I

### A.

Southwest Airlines Co. ("Southwest") is a common carrier subject to the Railway Labor Act ("RLA"). The International Brotherhood of Teamsters ("the Teamsters") represents Southwest's mechanics and related employees. Article 2, paragraph 4 of the relevant Teamsters and Southwest collective bargaining agreement provides:

> Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement, and which have been made available to the employee prior to becoming effective.

Before 1986, Southwest's drug and alcohol policy consisted mainly of Rule G, a rule of many years' standing that had been unilaterally promulgated. Its provisions defined "serious, unacceptable conduct" and included the following:

> 4. Reporting for or carrying on work while showing any signs of the use of intoxicants or knowingly permitting another employee to do so is strictly prohibited.

> 5. Possession of or drinking of any intoxicant or illegal possession or use of illegal dangerous drugs on Company premises or while in uniform and/or habitual use of intoxicants or use of illegal or dangerous drugs on or off duty will not be tolerated.

Rule G had no significant history of enforcement; nor did Southwest have a known problem with employee use of alcohol or drugs. Nevertheless, Southwest decided to expand its drug policy. Specifically, it decided to implement a drug and alcohol testing program. The program is comprehensive and detailed. It prohibits detectable levels of illegal drugs, defined blood alcohol levels, and any level of medication that could impair performance, as well as any possession of illegal drugs. To enforce these prohibitions, the program mandates pre-employment urine drug screening, and urine drug screening of employees after accidents or if management has a reasonable suspicion of drug or alcohol use. The program establishes detailed testing procedures, and prescribes punishment, including discharge, for violations of the policy.

On October 16, 1986, Southwest informed the Teamsters of its intention to implement the program. The Teamsters then sought to bargain over the terms of the program. Southwest was willing to discuss the program, but refused to negotiate with the Teamsters over it. Other unions did participate in discussions with Southwest, and these discussions affected the shape of the program.

### B.

In December 1986, the Teamsters filed this action, seeking to enjoin Southwest's unilateral imposition of the program. In January 1987, the district court granted a preliminary injunction. The district court reasoned that the implementation of the program was not arguably justified under the terms of the collective bargaining agreement and that, therefore, the dispute was "major" and thus subject to bargaining before implementation. In the alternative, the district court held that even if the dispute were "minor," a preliminary injunction was warranted by the likelihood of irreparable harm to employees if the program were enforced before the union's objections to the program could be arbitrated.

Southwest appealed the preliminary injunction and it was affirmed. 842 F.2d 794. The panel concluded that the program was a mandatory subject of bargaining under the RLA that had not been clearly and unmistakably waived by the Teamsters in the management rights clause of the agreement. Next, the panel agreed with the district court that the dispute was "major" because it was not arguably justified by the management rights clause, Rule G, or past practices of the parties. As a major dispute, the matter was subject to bargaining and could not be unilaterally imposed by Southwest.

Sitting *en banc*, we disagree that the dispute is major; we thus reverse the district court and dissolve the injunction.

### C.

■ We first note that this case continues to present a justiciable controversy. Although the agreement precipitating the suit has since terminated and a new one has been negotiated, the parties did not bargain about or agree upon a resolution to this dispute. The relevant terms of the new agreement track those of the old. Furthermore, Southwest adheres to its position that it is entitled to implement unilaterally its drug testing program, and has expressed its intention to do so should this court vacate the injunction. The union continues to object to the unilateral imposition of the program. The injunction has not expired of its own force.

Therefore, in deciding whether the injunction should stand, we need not avoid the merits of the suit by finding it moot. A case is not moot so long as "the prospect of repetition may affect continuing relationships in clear and tangible ways." C. Wright, A. Miller, and E. Cooper, 13A *Federal Practice and Procedure*, § 3553.3 (2d ed.1984). Labor litigation, which presents both the problem of lapsed contracts and settled suits, has frequently required courts to determine whether such "clear and tangible" influence continues despite changes in the relation between the parties. In order to deal with this problem, there has arisen "a doctrine, apparently peculiar to labor questions, that governs the determination of mootness when parties agree on a new contract during the pendency of the suit." *Division 580 v. Central New York RTA*, 578 F.2d 29, 32 (2d Cir.1978). The special treatment due labor questions has been recognized several times by the Supreme Court. *See, e.g., Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 704 n. 1, 102 S.Ct. 2672, 2776 n. 1, 73 L.Ed.2d 327 (1982); *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 403 n. 8, 96 S.Ct. 3141, 3146 n. 8, 49 L.Ed. 2d 1022 (1976); *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). In *Jacksonville Bulk Terminals*, the Court adjudicated a dispute arising out of a work stoppage. The stoppage had been voluntarily abandoned six months before the Court heard argument, but the Court held the case justiciable nonetheless. It commented, "[T]here remains a live controversy over whether the collective-bargaining agreement prohibits politically motivated work stoppages, and the Union may resume such a work stoppage at any time. As a result, this case is not moot." 457 U.S. at 704 n. 1, 102 S.Ct. at 2676 n. 1. Similarly, the Court found a live controversy in *Buffalo Forge* despite the fact that the collective bargaining agreements in effect when the action arose had expired, where the parties

stipulated that those agreements governed the resolution of that dispute. 428 U.S. at 403 n. 8, 96 S.Ct. at 3146 n. 8. In the same way, the parties here, in effect, simply declined to settle this action when they negotiated a new agreement without resolving this dispute. Thus, our case is no less justiciable than *Buffalo Forge* or *Jacksonville Bulk Terminals.*

## II

### A.

■ The premise of the Teamsters' request for an injunction begins with Southwest's duty to bargain with the union before imposing terms of employment, including rates of pay, rules, and working conditions. 45 U.S.C. § 152, First, Second. Once bargaining has resulted in an agreement, however, not all disputes over changes in the terms of employment are subject to a continuing duty to negotiate. Rather, the RLA distinguishes the procedures for resolution of two different types of disputes that arise under a collective bargaining arrangement, which have come to be known as major and minor disputes. *See Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945). "Major" and "minor" do not necessarily refer to important and unimportant disputes, or significant and insignificant issues; rather, the terms refer to the bargaining context in which a dispute arises. Major disputes involve proposals for new agreements or for changes in existing agreements. *Id.* at 723, 65 S.Ct. at 1289. Minor disputes, on the other hand, involve grievances over the application of an existing agreement. *Id.* This distinction matters because the RLA prescribes differing courses for the resolution of these two types of disputes. Major disputes go first to mediation; if not resolved, the parties may agree voluntarily to arbitrate, or the President may intervene, 45 U.S.C. § 155, First, § 160. During these steps parties must abide by the existing agreement; only if these steps fail may the parties resort to strikes or other self-help or, in the case of management, unilateral action. *Burlington Northern R.R. Co. v. Brother-*

*hood of Maintenance of Way Employees,* 481 U.S. 429, 107 S.Ct. 1841, 1851, 95 L.Ed. 2d 381; 45 U.S.C. §§ 155, 156, 160. Until these preliminary steps are exhausted, unilateral action can be enjoined. *International Association of Machinists v. Frontier Airlines, Inc.,* 664 F.2d 538, 540–41 (5th Cir.1981).

■ Minor disputes are treated differently. If the parties do not agree on the interpretation or application of an agreement, the dispute is submitted to arbitration before an adjustment board. 45 U.S.C. § 153. Unlike its policy governing major disputes, the RLA does not prohibit unilateral action based on a party's own interpretation of the agreement pending exhaustion of arbitration; only in a narrow set of cases may unilateral action be enjoined during resolution of a minor dispute. *Frontier Airlines,* 664 F.2d at 541. Thus, the propriety of the injunction imposed by the district court turns on whether the dispute over Southwest's right under the agreement to implement the drug testing program unilaterally is a major or a minor dispute.

■ Case law has refined the test for whether a dispute is minor. Under Fifth Circuit precedent, a dispute is minor if the existing collective bargaining agreement affords some arguable basis for the underlying action. *REA Express, Inc. v. Brotherhood of Railway, Airline and Steamship Clerks,* 459 F.2d 226, 231 (5th Cir. 1972) (quoting *United Industrial Workers v. Board of Trustees,* 351 F.2d 183, 188 (5th Cir.1965)). *REA Express* involved a claim by management that an agreement provided a procedure for altering truck runs. 459 F.2d at 230. According to the court, "[t]he key word in this test is 'arguable.' If the court finds an arguable basis it must defer to the expertise of the Adjustment Board." *Id.* at 231. In a similar, earlier case, where a railroad based its right to abolish yardmaster positions on a clause (Rule 16(e)) providing that the agreement "shall not be construed as ... restricting the Company's right to discontinue yardmaster positions," this circuit reversed a lower court decision that the dis-

pute was major. *St. Louis, Santa Fe and Topeka Ry. Co. v. Railroad Yardmasters of America*, 328 F.2d 749, 751, 754 (5th Cir.1964).

> Unless we are to ignore completely the language of Rule 16(e) which on its face, according to the ordinary understanding of the English language does authorize the abolition of yardmaster positions, we are at a loss to understand how it could be decided that the rights of the union can be determined without a construction of the employment contract or agreement. We do not, of course, ... attempt to construe the contract. This is to be done by the appropriate tribunal. We do say that a defense based upon the language of Rule 16(e) raises a substantial issue as to the interpretation of the contract. It is not a fictitious or merely colorable issue. Before a tribunal can decide that the terminations at issue were not justified, it must construe the language of Rule 16(e).

*Id.* at 753.

Other cases have also applied this test to disputes over management's right under an agreement to take certain actions. *See, e.g., Railway Express Agency, Inc. v. Brotherhood of Railway, Airline and Steamship Clerks*, 437 F.2d 388 (5th Cir. 1971). In *Railway Express Agency*, the court described a dispute over a change in work assignment as follows:

> The dispute in reality is over the breadth of management's prerogative.... [T]here is no express provision allowing management to transfer the work unilaterally. However, the agreement does expressly reserve "the right of management to determine methods of operation and the utilization of the working forces...." Moreover, there is an undisputed history of such unilateral transfers of work with no apparent objection from the union. It may be concluded ... that this state of facts gave REA at least the arguable right to make the transfer.... Whether it actually has such a right must be determined by the Special Adjustment Board.

*Id.* at 392. In reaching this conclusion, the court in *Railway Express Agency, id.* at

393–94, relied heavily on *Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21 (2d Cir.1962). In *Rutland,* the Second Circuit was faced with the question

> whether the railroad has the unilateral right to make ... changes [in train schedules] without negotiating about them with the brotherhoods.... Whether it be a major or a minor dispute, the disagreement is a dispute over the scope of the railroad's managerial prerogative. It is a major dispute if the present agreements between the railroad and the brotherhoods contain express provisions contrary to the position taken by the railroad or if the clear implication of these agreements is inconsistent with the railroad's proposals. It is a minor dispute if there is a clearly governing provision in the present agreements, although its precise requirements are ambiguous; and it is also minor if what the railroad seeks to do is supported by customary and ordinary interpretations of the language of the agreements.

307 F.2d at 33–34 (citations omitted). The court there went on to hold that the dispute was minor even though no provision in the agreement explicitly granted the railroad the right to make the challenged changes unilaterally. *Id.* at 35–36 (citing cases where courts faced with similar disagreements classified the disputes as minor).

■ These cases clearly establish the rule that if the management's underlying action is arguably justified by the collective bargaining agreement, the dispute is minor. *Railway Express*, 459 F.2d at 231. In other words, if management's construction of the collective bargaining agreement and its unilateral action pursuant thereto create an issue that is not fictitious or merely colorable, then the issue should be resolved by the appropriate arbitration board. *St. Louis, S.F. & T. Ry.*, 328 F.2d at 753.

### B.

#### (1)

■ Although the district court recited and applied this standard, we cannot accept

its conclusion that this clause did not even arguably justify the program. On its face, this clause at least *arguably* grants management the right to enforce its policy by unilaterally promulgating rules, regulations, and orders such as this drug testing program. The clause provides:

> Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement, and which have been made available to the employee prior to becoming effective.

In harmony with its provisions, the following facts cannot be denied: (1) the program consists of rules, regulations and orders within the meaning of this clause; (2) the program was issued by the proper authorities of the company; (3) no term or condition of the collective bargaining agreement conflicts with the program; (4) the program was made available to employees prior to becoming effective. Thus, Southwest seems to have complied fully with all conditions of the management rights clause to which the union had agreed. As a result, it is *arguable* that the program is a proper exercise of management's rights. The *merits* of the interpretation of the agreement are clearly for the arbitrator to decide.

The panel opinion nevertheless states that this clause "does not speak at all to the right to bargain over rules, only the willingness to abide by rules validly enacted." Although this may ultimately be the correct interpretation of the clause, we decline to say that the plausibility of such interpretation bars the contrary view that the clause binds employees to any and all rules that do not conflict with the agreement and that are promulgated by management with advance notice. Since the outcome thus turns on a choice between two arguable constructions, the dispute is minor, and must be submitted to arbitration.

This conclusion is further supported by the history of rule-making under the agreement. Southwest unilaterally promulgated Rule G, a rule establishing a drug and alcohol policy. Although Rule G has not required significant enforcement, its existence demonstrates a history under the agreement of unilaterally promulgating rules supporting a drug and alcohol policy. Thus, although the drug testing program is more extensive than Rule G, the unquestioned validity of Rule G, when considered in tandem with the management rights clause, indicates that the new program is arguably justified by the collective bargaining agreement.

### (2)

The Teamsters argue further, however, that Southwest's unilateral implementation of the program will infringe on the union's statutory right to bargain. The panel held, and we agree, that the program effects a change in rules and working conditions and therefore is a mandatory subject of bargaining. Of course, the same is true of any new rule or order promulgated under the management rights clause that affects working conditions, however insignificant such rule might be. The panel also held, however, that Southwest had to bargain over the program because the management rights clause does not constitute a waiver of the union's right to bargain about rules, regulations, and orders such as the drug testing program.

In general, the contractual waiver of a statutory right under federal labor law must be clear and unmistakably expressed. *Metropolitan Edison Co. v. N.L.R.B.*, 460 U.S. 693, 707–08, 103 S.Ct. 1467, 1476–77, 75 L.Ed.2d 387 (1983). *Metropolitan Edison* concerned a no-strike clause, but this general rule of construction has been applied to questions of waiver of the duty to bargain. *See, e.g., NL Industries, Inc. v. NLRB*, 536 F.2d 786, 788–89 (8th Cir.1976); *Pepsi–Cola Distributing Co.*, 241 N.L.R.B. 869 (1979); *Ador Corp.*, 15 N.L.R.B. 1658 (1965); *General Motors Corp.*, 149 N.L.R.B. 396, 399–400 (1964). All of these cases, however, arose under the National Labor Relations Act ("NLRA"). We are not certain that this rule of construction applies identically to the RLA. The rule operates to

protect rights defined by statute. Thus, we turn to the RLA to examine the nature of the bargaining right at issue here. The RLA, like the NLRA, does create a duty to bargain. Unlike the NLRA, however, the RLA distinguishes minor from major disputes and thereby defines within the statute the specific procedures governing the right to bargain, including the proper forum for resolving disputes over the extent of that right under an existing agreement. Thus, the statutory right to bargain created by the RLA, unlike that of the NLRA, is limited by the RLA's precise regulation of procedures for dispute resolution. We note, furthermore, that none of this circuit's cases involving contractual claims to management rights (see discussion above), discusses the issue in terms of a "clear and unmistakable waiver." In fact, there appears to be a tension between deciding on the one hand whether a management rights clause *arguably* permits management to take some action, and deciding on the other hand whether such a clause *clearly and unmistakably* waives the right to bargain. Given the difference between the statutes, and given our prior cases, we find it to be a debatable matter of law whether, or to what extent, the rule of construction requiring that a waiver of bargaining rights under the NLRA be clear and unmistakable applies in a case arising under the RLA.

We find, however, that we are not squarely presented at this time with the question of how the "clear and unmistakable" rule applies to RLA cases. Even assuming, as the panel opinion assumes, that the management rights clause can give Southwest the right unilaterally to implement the program only if the clause is a clear and unmistakable waiver, the construction proposed by Southwest satisfies the minimal burden of arguably being a clear and unmistakable waiver. As noted above, the clause on its face binds employees, for the period of the agreement, to all rules, regulations, and orders that are issued by proper authorities, are not in conflict with other terms of the agreement, and are published in advance. Since there is no dispute that these conditions have been satisfied here, it seems clear that the drug testing program is a rule or regulation that falls within the terms of the management rights clause. Thus, there is an obvious argument that this clause constitutes a clear waiver of the union's right to bargain over *all* rules, including the new drug rules. We reiterate, of course, that we are not actually deciding the applicability or scope of this clause. We decide only that the arbitration board is the forum authorized to construe the clause.

### III

The district court held in the alternative that, even if the dispute is minor, an injunction is nevertheless warranted because of the potential harm of an improperly implemented drug testing program. We review this alternative holding under a deferential standard, and reverse only for abuse of discretion. *Frontier Airlines*, 664 F.2d at 542. We also note, however, that the proper grounds for granting an injunction against action that is the subject matter of a minor dispute under the RLA are extremely narrow. *Id.* at 541–42. Such injunctions may issue only where necessary to preserve the jurisdiction of the grievance procedure, or where a disruption of the status quo would result in irreparable injury of such magnitude that it would render any subsequent decision meaningless. *Id.* at 542. The district court found that irreparable harm to an employee's reputation could result, for example, from disciplinary action taken against that employee or from an employee's refusing to be tested under the program. Since many employment disputes involving discharge implicate the reputation of an employee, we do not believe that this speculative possibility of irreparable harm is of the magnitude required to support an injunction in the context of a minor dispute. Accordingly, we hold that it was an abuse of discretion to issue an injunction on the facts of this case.

### IV

The drug testing program implemented by Southwest is arguably justified by the

management rights clause in the agreement. Thus, this dispute is minor, and the district court's injunction pending the dispute's resolution was improper. Accordingly, the injunction is

VACATED.*

GOLDBERG, Circuit Judge, with whom POLITZ, JOHNSON, and JERRE S. WILLIAMS, Circuit Judges, join, dissenting:

> Old Mother Hubbard
> Went to the cupboard,
> To fetch her poor dog a bone;
> But when she got there
> The cupboard was bare,
> And so the poor dog had none.

The panel opinion in this case stands in response to the *en banc* majority's decision today. 842 F.2d 794. I add these dissenting words to emphasize that if the cupboard is barren, it is only because the majority has decided to empty it. Assuming

the hegemony of management prerogative, the majority dresses its holding in the diaphanous garb of a Mother Hubbard Clause.[1] But the majority has paid a high price for its chosen garment. The decision clashes with the law of other circuits, and leaves the fabrics of both the parties' contract and the Railway Labor Act torn and frayed.[1a]

This case simply concerns the relative volumes of a Union's and employer's voices under a collective bargaining agreement.[2] We have no occasion to address either the wisdom or propriety of drug testing. The Union is not opposed to drug testing *per se* (R. 114). The Union's members simply wish to exercise their statutory right to bargain over the program's terms, and the Union rightfully believes that its members' ideas and interests are properly expressed in the major dispute process in the first instance, not weighed in the arbitral scales.[3]

---

* Because of timing, *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, —— U.S. ——, 109 S.Ct. 2477, —— L.Ed.2d —— (1989), played no role in the consideration of this case by our en banc court. In *Consolidated Rail*, the Supreme Court held that the railway's inclusion of drug testing in periodically required physical examinations raised a minor dispute in that the action was arguably justified by implied terms of the parties' agreement. There are significant differences between the facts of *Consolidated Rail* and our case, as well as distinct contractual bases for the respective decisions. We note only that the Supreme Court's discussion of major and minor disputes supports our analysis and conclusion, and we see nothing in our opinion requiring modification on account of the Supreme Court's decision in *Consolidated Rail*.

1. Mother Hubbard is not well-known in the field of labor relations. The term "zipper clause" is more commonly used to describe the type of management rights clause that the majority assumes arguably controls this case. *See* Part IV(A) *infra*. Mother Hubbard is widely recognized, however, among oil and gas litigants, *see, e.g., Paul Rochester Investment Co. v. United States*, 692 F.Supp. 704, 710–11 (N.D.Tex. 1988), not to mention children the world around.

1a. As the majority states in its footnote, the Supreme Court decided *Consolidated Rail Corp. v. RLEA*, 57 U.S.L.W. 4742, —— U.S. ——, 109 S.Ct. 2477, —— L.Ed.2d —— (1989), after our full consideration of this case. I agree that *Consolidated Rail* adopts the "arguably justified" standard for

determining whether a dispute is major or minor. I also believe that the case is distinguishable from our case on its facts. However, I do not agree that *Consolidated Rail* "supports [the majority's] analysis and conclusion."

In *Consolidated Rail*, the Court held that the union had arguably bargained for particular management "discretion to make a particular change in working conditions without prior negotiation...." —— U.S. at —— n. 7, 109 S.Ct. at 2484 n. 7. In other words, within the particularized zone of management discretion for which the union arguably had bargained, which was arguably contained in the controlling implied terms of the already-formed agreement, management's unilateral act, arguably, was not a "change in the agreement" within the meaning of 45 U.S.C. §§ 152, Seventh, 156; *Elgin, J. & E. R.R. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). Accordingly, the Court in *Consolidated Rail* held that the dispute was minor.

In this case, the majority finds Southwest's arguable discretion to act unilaterally in a boilerplate management rights clause. As I discuss below, absolutely nothing in this case suggests that the Union has bargained away such vistas of discretion to Southwest.

2. *See* A. Hirschman, *Exit, Voice and Loyalty* (1970).

3. In this age of the drug scourge, we cannot allow this labor dispute to be colored by whether employees' contractual rights should or may

According to the majority, implementation of the testing program would "effect[ ] a change in rules and working conditions." Thus, this contest is subject to the major dispute resolution process under the stat-

ute [4] unless the Union has waived its right to bargain over the change. The majority routes this dispute to the adjustment board, holding that the Union has arguably waived its members' bargaining rights.[5]

be subordinated to employer or social interests in safety, efficiency or property. *Cf. Skinner v. Railway Labor Executives Association,* —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Federal Railway Administration drug testing regulations do not violate Fourth Amendment).

The Federal Aviation Administration ("FAA") has issued extensive drug testing regulations that impose requirements on air carriers including Southwest, and the regulations appear to extend only to some of the employees represented by the Union. 53 Fed.Reg. 47024 (Nov. 21, 1988) (available on LEXIS, Genfed Library, Fedreg file). Many aspects of these regulations appear to be constitutional. *See Skinner v. Railway Labor Executives Association,* —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

Under the FAA regulations, Southwest was required to have submitted a testing plan for approval to the FAA not later than April 20, 1989. The FAA regulations require an air carrier *to implement preemployment testing of job* applicants not later than 10 days after FAA approval of the carrier's plan. Air carriers are required to implement the remainder of their plans not later than 180 days after FAA approval. Pursuant to the regulations, FAA approval makes the plans effective.

The FAA regulations do not sweep as widely as Southwest's program in certain respects. Thus, if the parties reach the bargaining table, there will be elements of Southwest's program that may not be mandated or precluded by federal law. Southwest must bargain over such elements if the Union has not waived its right to bargain.

Although it is not difficult to comprehend that critical components of the FAA regulations will impose on both parties as a matter of law what the Union wished to negotiate when it filed this lawsuit, I analyze the substance of Southwest's program as it has reached this court in stating my position in this case. Whatever is nonnegotiable as a result of the FAA regulations would become apparent if the parties reach the bargaining table.

*See also* note 31 *infra.*

4. An employer has a statutory duty to bargain in good faith over proposed changes in working conditions. 45 U.S.C. §§ 152, 155, 156. Proposals to change or unilateral attempts to change rates of pay, rules or working conditions are subject to the major dispute process. 45 U.S.C. §§ 155, 156, 160; *Elgin J. & E. Railway Co. v. Burley,* 325 U.S. 711, 723–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945); *Order of Railroad Telegraphers v. Chicago & Nw. Ry.,* 362 U.S. 330, 80 S.Ct. 761, 766, 4 L.Ed.2d 774 (1960); *United Industrial Workers v. Board of Trustees,* 351 F.2d 183, 189–91 (5th Cir.1965); *Brother-*

*hood of Locomotive Engineers v. Burlington Northern,* 838 F.2d 1087, 1093 (9th Cir.1988), cert. pending, 57 U.S.L.W. 3017 (July 19, 1988); *see First National Maintenance v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 2585 n. 23, 69 L.Ed.2d 318 (1981). *See also infra* Part IV.

5. Although the majority does not hold that a union may waive its members' privacy rights, the majority's cavalier treatment of a management rights clause in this delicate area is disturbing. There are limitations on a union's ability to bargain away employee rights. *See, e.g., Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 51, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974) ("an employee's rights under Title VII are not susceptible of prospective waiver") (citation omitted). There may be similar limitations on a union's attempt to bargain away privacy rights guaranteed by state and federal common law, statutes and constitutional provisions applying to the conduct of non-state actors. *See Lingle v. Norge Division of Magic Chef, Inc.,* —— U.S. ——, 108 S.Ct. 1877, 1883 n. 9, 100 L.Ed.2d 410 (1988) ("Whether a union may *waive* its members' individual, nonpre-empted state law rights is ... [an] issue we need not resolve today") (emphasis in original); *see also* P. Levy, State Regulation of Drug Testing: Are Organized Workplaces Exempt?, 1988 U.Chi.Legal F. 141; *but see Utility Workers v. Southern California Edison,* 852 F.2d 1083, 1086 (9th Cir.1988) ("Resolution of the issue whether [the union] has bargained away its members' claimed [privacy rights under the California Constitution] must rest upon interpretation of the collective bargaining agreement [and the claims are therefore preempted under 29 U.S.C. § 185(a) ] (1982)"), cert. denied, —— U.S. ——, 109 S.Ct. 1530, 103 L.Ed.2d 835 (1989); *Jackson v. Liquid Carbonic Corp.,* 863 F.2d 111, 119 (1st Cir.1988) ("the underlying issues raised by [appellant's] privacy claims ... depend to a great extent upon the concessions the unions made regarding working conditions during collective bargaining"). While I do not agree with the language concerning waiver in either *Utility Workers* or *Jackson,* the cases demonstrate that employees in some jurisdictions may have little to rely on in the area of drug and alcohol policy enforcement apart from the bargain their union has struck for them.

The majority routes this dispute to the arbitral forum. If the arbitral forum concludes that Southwest must bargain over the terms of the programs, then there may be limitations on the Union's ability to bargain away employee privacy rights. There may be limitations in any case, apart from federal labor law, on Southwest's ability to impose certain terms of the testing

The majority holds (1) that the contract is materially silent,[6] which allows the management rights clause to play a role in this case; and (2) that the management rights clause is arguably a global zipper clause cutting solely in Southwest's favor. Under both the Railway Labor Act and the facts of this case, the majority's holding is sweeping and unjustified, but at least one point must be clear: the majority does not hold simply that the Union has arguably waived its right to bargain over the terms of a drug testing program, which would be disturbing enough; the majority holds that the Union has arguably waived its right to bargain over *any* change in working conditions when the contract is silent.

My opinion is divided into five parts. In Part I, I briefly describe the facts. Part II addresses why this case is not moot, and why abstention would not be prudent. In Part III, I outline the none-too-simplistic statutory scheme controlling our inquiry.

Part IV addresses the majority's *ratio decidendi:* that the bargaining agreement's management rights clause is arguably a zipper clause by which the Union has arguably waived its members' bargaining rights. The majority's *ratio decidendi* stems from a cavalier treatment of deeply-embedded waiver principles. Absolutely nothing in the record below, apart from the

language of the management rights clause itself, suggests waiver, arguable or otherwise. No less important, the majority's result is inconsistent with both the statutory scheme and case authority.

Finally, in Part V, I demonstrate that the majority should not even reach its *ratio decidendi* because the management rights clause should play no role in this case. The clause does not apply by its own terms, whatever it means, if a unilaterally attempted or proposed change in working conditions would conflict with existing terms of the bargaining agreement. An industry work rule, Rule G, contains the parties' contemplated drug and alcohol policy under the contract. Visual observation [7] is the parties' contemplated method of Rule G enforcement under the contract. The testing program contains both a revised policy [8] and a radically different method of policy enforcement: blood alcohol testing and urinalysis.

Nothing in the record suggests that the Union has acquiesced in the extremely intrusive method of policy enforcement constituted by blood alcohol testing and urinalysis.[9] Blood alcohol testing and urinalysis, if implemented unilaterally, would conflict with, and utterly violate, contractually protected rights of the Union's members that were created, and are protected, by the

---

program on the employees. *But see* Federal Aviation Administration Drug Testing Regulations, 53 Fed.Reg. 47024 (Nov. 21, 1988); *Skinner,* — U.S. ——, 109 S.Ct. 1402.

**6.** The majority states that "the following *fact[ ]* cannot be denied: . . . no term or condition of the collective bargaining agreement conflicts with the [testing] program" (emphasis added). I assume *arguendo* in Part IV below that the testing program at least arguably conflicts with existing contractual terms.

**7.** The phrase "visual observation" describes relatively nonintrusive supervisorial and coworker observation of employee behavior to determine whether the employee may reasonably be suspected of being impaired or intoxicated, or whether the employee demonstrates signs of habitual drug or alcohol use.

Trained supervision "can detect those who chronically abuse any type of drug and who are impaired at work." *Taylor v. O'Grady,* 669 F.Supp. 1422 (N.D.Ill.1987). Thus, proper instruction of workers and supervisors concern-

ing the signs of impairment and chronic drug use can be an effective method of identifying drug and alcohol abuse in the workplace to enforce a drug and alcohol policy such as Rule G; *but cf. Skinner,* — U.S. ——, 109 S.Ct. 1402.

**8.** Because the program irreconcilably conflicts with the nonintrusive methodology of visual observation, which should itself send this contest to the major dispute process, I do not reach the issue of conflict between the policy contained in Rule G and the revised policy contained in the testing program.

**9.** If drug and alcohol policies and enforcement methodologies are fungible, it would seem that implementation of the testing program would at most arguably give rise to a change in working conditions under the statute. Because my position is responsive, I assume *arguendo* that it is possible to hold simultaneously that (1) the methodologies do not conflict; and (2) implementation of the testing methodology would constitute a change in working conditions.

**1140**

contract's existing, relatively nonintrusive enforcement methodology of visual observation. Three other circuits, like the now-vacated panel opinion, 842 F.2d 794, have decided the issue of methodological difference at the threshold as a question of law.[10] The majority abdicates its responsibility to undertake an identical inquiry. Because the testing program's methodology conflicts with existing terms of the collective bargaining agreement, this dispute does not belong before an adjustment board under any circumstances.

## DISCUSSION

### I. *Factual Summary.*

The panel opinion recounts the facts fully. 842 F.2d at 796–98. This summary outlines the panel's full exposition.

Southwest Airlines Co. ("Southwest") is a common carrier by air subject to the Railway Labor Act. The International Brotherhood of Teamsters ("Union") represents Southwest's mechanics and related employees. Southwest advised the Union on October 16, 1986 that it desired to implement unilaterally a drug and alcohol testing program ("program" or "testing program"). The Union sought to bargain over the program's terms. Southwest refused to bargain and unilaterally attempted to implement the program on January 1, 1987. The Union immediately sought a preliminary injunction. The district court granted the injunction on January 9, 1987 (R. 263). *See* 842 F.2d at 798. The panel affirmed the district court on April 21, 1988. *Id.* at 794.

The terms and conditions of a labor contract include both express terms and implied terms created by the past practices of the parties. *See Detroit & Toledo S.L.R.*

*Co. v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). The district court found that before Southwest attempted to implement the testing program, Southwest's drug and alcohol policy was contained in Rule G, a unilaterally imposed work rule in which the Union had acquiesced.[11] Rule G prohibits employees from "reporting for or carrying on work while *showing any signs* of the use of intoxicants or knowingly permitting another employee to do so" [sic]. Rule G also prohibits "possession of or drinking any intoxicant or illegal possession or use of illegal or dangerous drugs on company premises or while in uniform and/or habitual use of intoxicants or use of illegal or dangerous drugs on or off duty."

Before Southwest attempted to implement the program unilaterally, Southwest's sole method of enforcing Rule G had been visual observation of employee behavior. The district court also found that there has been no application of the enforcement method because there is no history of problems with drug or alcohol abuse.

The testing program contains both a revised drug and alcohol policy and an extremely intrusive means of enforcing the revised policy.[12] The revised policy prohibits employees from working with detectable levels of drugs, defines a blood alcohol level of .05% as evidencing alcohol intoxication, and prohibits the use of over-the-counter and prescription drugs that may impair performance. The testing program establishes punishment up to and including discharge for violations of the policy.

The testing program's intrusive methodology is unprecedented in the parties' bargaining history. The program requires mandatory urine screens and/or blood alcohol tests (1) "[a]fter each vehicular equip-

---

**10.** *Transport Workers Union v. SEPTA,* 863 F.2d 1110, 1122–24 (3d Cir.1988); *Brotherhood of Locomotive Engineers v. Burlington Northern,* 838 F.2d 1087, 1092–93 (9th Cir.1988), *cert. pending,* 57 U.S.L.W. 3017 (July 19, 1988); *Brotherhood of Locomotive Engineers v. Burlington Northern,* 838 F.2d 1102, 1105–07 (9th Cir.1988); *Brotherhood of Maintenance of Way Employees v. Burlington Northern,* 802 F.2d 1016, 1022–23 (8th Cir.1986) (Arnold, J., concurring in part for a unanimous panel).

**11.** Rule G was promulgated many years ago by the Association of American Railroads. *Skinner,* —— U.S. at ——, 109 S.Ct. at 1407.

**12.** The terms of the program are outlined in full at 842 F.2d 797–98. Regulations recently promulgated by the Federal Aviation Administration do not immediately bear on this dispute. *See* note 3 *supra* and note 31 *infra.*

ment and/or aircraft damage accident *unless* management waives the test" (emphasis in original); (2) whenever Southwest has reasonable suspicion that an employee has violated the program's policy; and (3) "whenever a previously non-physicalled [sic] employee successfully interviews for a position within the company which requires a physical examination." The program also contains testing procedures giving Southwest absolute discretion (1) to determine the testing laboratories to be used; concerning (2) chain-of-custody safeguards; (3) confidentiality; and (4) concerning use of employee releases.

Southwest has attempted to implement a program unilaterally which by its terms provides for· urinalysis or blood alcohol testing of *any* company employee at Southwest's discretion "after each vehicular equipment and/or aircraft damage accident." The program, then, requires no suspicion of a particular employee or even group of employees in such circumstances, and therefore gives Southwest absolute discretion after any accident to require any male or female company employee to be subjected to the puncturing of his or her skin in search of blood, and/or to urinate into a container, which must be performed in full view of a witness to prevent the substitution of fraudulent samples.

In addition, the program gives Southwest absolute discretion to provide for specimen chain of custody procedures and to contract with any outside laboratory.[13] Error in either of these areas of discretion, which is inherent in the methodology to a certain degree, would have a dramatic impact on the employees' workaday world. Furthermore, while Southwest's program contains confidentiality provisions, the results of any test are both restricted to and abso-

lutely available to "the Vice President of the respective department and the Review Board." Thus, Southwest has unrestricted access to information having nothing to do with drug or alcohol use that is contained in blood or urine samples to which the company, testing only for drug use, may not otherwise be entitled. Blood and urine samples may disclose the existence of pregnancy, epilepsy and diabetes, *Skinner*, —— U.S. at ——, 109 S.Ct. at 1413, and may even disclose clinical depression. *Id.* at 1429 (Marshall, J., dissenting).

## II. *Mootness and Abstention.*

I agree with the majority that this case is not moot even though the parties have bargained a new contract without resolving their dispute.[14] My additional discussion also addresses Judge Rubin's alternative suggestion that we should abstain from deciding this case, even assuming it is not moot, based on his belief that we are being manipulated in the parties' bargaining process.

We are not being manipulated by the parties. Private parties impermissibly attempt to manipulate federal courts when, for example, they contract to place jurisdiction in a particular court, which would otherwise have no power to decide a dispute that might arise · under the parties' contract. In this case, neither party had a reason to bargain over the testing program after the district court issued the injunction.

Southwest will bargain only if coerced by a court or board of adjustment. From the moment this dispute arose, Southwest has refused to bargain over the testing program. Southwest still refuses to concede

---

**13.** The quality of a testing laboratory determines the accuracy of a testing program. Laboratories are not subject to rigorous licensing requirements. Some are professional. *Skinner*, —— U.S. at ——, 109 S.Ct. at 1409. Some are incompetent. Elaine Shoben, *Test Defamation in the Workplace*, 1988 U. Chi. Legal F. 181, 183 nn. 11 and 12 (discussing articles that describe laboratory incompetence in equipment use and specimen custody procedures).

**14.** Labor contracts commonly have a fairly short duration. The contract in this case was in effect from August 16, 1982 to August 16, 1987 (R. 87). Southwest gave notice of its intent to implement the testing program on October 16, 1986 (R. 186). Southwest implemented the program on January 1, 1987. Thus, only seven and one-half months after Southwest's attempt to implement the program unilaterally, which the Union challenged .immediately, the bargaining agreement expired.

that it has a statutory duty to bargain over the testing program's terms.

More important, the Union's position results from the incentive structure created by the district court's issuance of the injunction. While the parties were still bound by their original agreement, the district court enjoined Southwest from implementing the testing program "pending both appeal and final disposition" (R. 264). No preexisting legal rule suggested to the parties that the relief explicitly granted by the district court would dissipate before judicial resolution of the labor dispute. Thus, from the moment the district court issued the injunction, the Union reasonably could have expected that its members would continue to be entitled to equitable relief. The Union consequently had no incentive to bargain away other issues in an attempt to bargain over the program's terms with Southwest, which absolutely has refused to bargain anyway. In short, the material incentives governing the parties' behavior offered no reason for a resolution of this particular dispute through bargaining or any other forum outside of the federal court proceeding in equity to which the parties were committed.

Labor disputes are not simply private squabbles. They have a substantial public cast because of pervasive, labyrinthine federal regulation. The district court's predicate role in this case is an integral part of that public cast. We therefore should decide this controversy, although I am quite disturbed by the result.

### III. *Mother Hubbard's Kitchen.*

Before analyzing this case, one must understand the distinctive, in some respects puzzling, framework of federal labor regulation under the Railway Labor Act ("RLA"). In the 1920s, railroad unions demonstrated an unparalleled solidarity among American workers, before either the rejuvenation of other AFL unions or the conception of the CIO.[15] Concerned with the effect of strikes on the transportation system, Congress passed the RLA in 1926, almost a decade before passage of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. ("NLRA").[16] The RLA constituted an innovative step in the history of labor relations, embodying a statutory policy of strike prevention and quasi-judicial dispute resolution almost a half century before the Supreme Court's decisions in the Steelworkers trilogy.[17] The RLA was amended in 1934 to provide for binding arbitration of certain disputes. *See Brotherhood of Railway Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 640,

---

**15.** For a recent discussion of the AFL's resurgence in the 1930s and the role of the CIO, see Christopher Tomlins, *The State and the Unions* (1987). For a traditional account, see Walter Galenson, *The CIO Challenge to the AFL* (1960).

**16.** The RLA's remarkable drafting history reflects its unusual character. "The bill was introduced as the product of negotiations and conferences between a representative committee of railroad presidents and a representative committee of railroad labor organization executives, extending over several months, which were concluded with the approval of the bill, respectively, by the Association of Railway Executives and by the executives of 20 railroad labor organizations." H.R.Rep. No. 328, Committee on Interstate and Foreign Commerce to the House of Representatives, 69th Cong., 1st Sess., quoted in *Texas & N.O. R. Co. v. Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 50 S.Ct., 427, 431, 74 L.Ed. 1034 (1930). *See also Elgin, J. & E. Railway Co. v. Burley*, 325 U.S. 711, 753 n. 1, 65 S.Ct. 1282, 1303 n. 1, 89 L.Ed. 1886 (Frankfurter, J., dissenting) (quoting December 25, 1925 message of President Coolidge: "I am informed that the railroad managers and their employees have

reached a substantial agreement as to what legislation is necessary to regulate and improve their relationship. Whenever they bring forward such proposals, which seems sufficient to protect the interests of the public, they should be enacted into law"). Cf. *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537, 55 S.Ct. 837, 846, 79 L.Ed. 1570 (1935) ("[W]ould it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries?").

**17.** *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). These cases made clear the federal labor policy favoring arbitration under the NLRA.

1 L.Ed.2d 622 (1957). In 1936, Congress extended the RLA to common carriers by air with the exception of 45 U.S.C. § 153, which provides for a National Railroad Adjustment Board, the arbitral forum. 45 U.S.C. § 181. Common carriers by air are subject to the provisions of 45 U.S.C. § 184, which provides for an arbitration system separate from the Railroad Adjustment Board.

A. *Major and Minor Disputes.* Unions and employers subject to the RLA primarily encounter two types of disputes arising from the collective bargaining agreements to which they are parties. In *Elgin, J. & E. Railway Co. v. Burley*, 325 U.S. 711, 723–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945), the Supreme Court attached the pregnant labels "major" and "minor" to the two types of disputes. A major dispute results from a party's proposed or unilaterally attempted *"change"* in the terms of a collective bargaining agreement *"affecting rates of pay, rules or working conditions."* 45 U.S.C. §§ 155, 156 (emphasis added); *Elgin, J. & E. Railway Co. v. Burley*, 325 U.S. 711, 723–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945). Minor disputes grow out of *"grievances,* or out of the *interpretation or application* of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 184 (emphasis added); *Elgin*, 325 U.S. at 723–24, 65 S.Ct. at 1289–90 ("minor disputes, ... involving grievances ... represent specific maladjustments of a detailed or individual quality"); *see also id.* at 723 n. 16, 65 S.Ct. at 1290 n. 16 (quoting legislative history emphasizing that minor disputes commonly concern grievances).

Whether a dispute is major or minor is not necessarily a result of its importance. A grievance may be quite important, although the dispute is minor, and a proposed change in the agreement may be relatively trivial, although the dispute is major. One's inquiry must always focus on whether a unilateral act or proposal would effect a change in rates of pay, rules or working conditions, because such a unilaterally attempted or proposed change gives rise to a major dispute. See Part IV *infra* and note 4 *supra.*

Major disputes and minor disputes are subject to quite different dispute resolution processes. Minor disputes are resolved through binding arbitration by a board of adjustment. 45 U.S.C. § 184. Parties may not resort to economic weapons while a minor dispute is pending before a board of adjustment. *Brotherhood of Railway Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957).[18] Major disputes result in a judicially-enforced status quo during which time the parties are subject to complex bargaining procedures. 45 U.S.C. §§ 155, 160. These procedures are not binding, however, and once they are exhausted, the parties may resort to their economic weapons without fear of a federal court injunction. *Burlington Northern v. Brotherhood of*

---

**18.** The RLA "contains 'no general provision prohibiting a party from acting unilaterally upon its interpretation of the contract pending exhaustion of the grievance procedures,' if indeed the dispute is a 'minor' one involving disagreement on the interpretation of the collective bargaining agreement, as to which strike action interrupting commerce is precluded by the statutory scheme." *International Association of Machinists v. Frontier Airlines*, 664 F.2d 538, 541 (5th Cir.1981) (quoting *Brotherhood of Locomotive Firemen and Enginemen v. Southern Pacific Co.*, 447 F.2d 1127, 1132 (5th Cir.1971) (additional citation omitted). Injunctions may be appropriate to preserve the status quo pending arbitration under the RLA in certain limited instances. *See* note 38 *infra; Frontier Airlines,* 664 F.2d at 541.

The Norris–LaGuardia Act, 29 U.S.C. §§ 101, 104, bars federal courts from issuing injunctions against unions in labor disputes. Under the NLRA, the Court has carved narrow exceptions out of the Norris–LaGuardia Act. *See Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The structure of the RLA demands federal court involvement to preserve the status quo in major disputes pending completion of the mediation process, and in narrow instances pending arbitration. Thus, the Court has held carefully that the Norris–LaGuardia Act "does not deprive [a] federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), quoted in *Burlington Northern v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 445, 107 S.Ct.1841, 1851, 95 L.Ed.2d 381, 398 (1987).

*Maintenance of Way Employees,* 481 U.S. 429, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987).[19] Thus, whether a federal court labels a dispute "major" or "minor" when the parties contest the issue will have quite important consequences.

Determining whether a dispute deserves the grand label of "major" or "minor" is sometimes simple but may be a conceptually frustrating task. An employer's proposal to cut wages in half, or a union's proposal to double wages, of course, would constitute a proposed change in the rate of pay and would therefore constitute a major dispute. And most grievances, for example, simply involve straightforward questions concerning whether a contract term should apply to an employee's act for which the employer attempts to impose discipline.[20] But other nominally minor disputes may ultimately appear to be major disputes because a definitive interpretation of a contract may seem to be substantively indistinguishable from alteration of the contract. One court has addressed the conceptual difficulty by stating that "the difference on the one hand between the interpretation and application of an existing agreement,

and, on the other hand, a change in the original intended basis of agreement is often a question of degree." *Rutland Railway v. BLE,* 307 F.2d 21, 33 (2d Cir.1962), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963).

The courts of appeals have articulated substantively similar standards to decide whether disputes are "major" or "minor" under the RLA scheme when the parties disagree. Under our circuit's standard, the dispute we confront is minor if Southwest's unilateral act is "arguably justified" by the terms of the parties' collective bargaining agreement. *Railway Express Agency v. BRAC,* 437 F.2d 388, 392 (5th Cir.), *cert. denied,* 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971). The "arguably justified" standard imposes a relatively light burden on Southwest, but the term "arguable" has content. As Judge Tuttle has well-articulated, even colorable contentions are not equivalent to the arguable contentions giving rise to a minor dispute. *St. Louis, S.F. & T. Railway v. Railroad Yardmasters of America,* 328 F.2d 749, 753 (5th Cir.), *cert. denied,* 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748 (1964).[21]

---

**19.** The March, 1989 strike of Eastern Airlines by the International Association of Machinists resulted from the exhaustion of procedures in the major dispute process. *See. e.g.,* Daily Labor Report No. 44 (March 8, 1989) (available on LEXIS, Labor Library, Dlabrt file).

**20.** For example, under a hypothetical collective bargaining agreement, an employer may discipline employees for tardiness. A proviso allows employees to punch their time cards "reasonably late" once a month without fear of discipline. An employee punches in thirty minutes late on the last day of the month. The employee otherwise has been on time all month. The employer attempts to discipline the employee for tardiness. The union grieves the issue, and the parties ultimately appear before the adjustment board.

The hypothetical dispute is minor, because it merely involves the application of the contractual standard to particular facts, and the outcome will ride on the interpretation of the term "reasonable" under the agreement. Such interpretation is an arbitral function. These sorts of disputes arise all the time under collective bargaining agreements, with both the employee's representative—the union—and the employer agreeing that the dispute is minor.

**21.** Under 45 U.S.C. §§ 153, 184, boards of adjustment are the proper fora to interpret the

terms of a collective bargaining agreement. But courts, of course, must read a collective bargaining agreement, consider evidence of past practices, and apply rules of construction to characterize a contested dispute as major or minor. At a high level of generality, any conclusion concerning the meaning of language constitutes interpretation. But although a decisionmaker's analysis implicates interpretive choice at a high level of generality, the application of constructive rules in determining whether a dispute is "major" or "minor" does not constitute "interpretation" under the RLA scheme as explained in *Elgin,* 325 U.S. 711, 65 S.Ct. 1282.

Courts face similar analytical difficulties in myriad contexts. *See, e.g., United Steelworkers of America v. Warrior & Gulf,* 363 U.S. 574, 80 S.Ct. 1347, 1353 n. 7, 4 L.Ed.2d 1409 (1960) (in § 301 actions under NLRA, court may not determine substance of arbitrable issue, but must make inquiry to determine at threshold whether dispute is arbitrable). Also, *for example,* in deciding whether a state law judgment is based on adequate and independent state law grounds, the Supreme Court must analyze a state court decision to reach its conclusion, although the distinction between proper analysis of a state court decision and improper interpretation of a state court's reasoning is sometimes difficult to

B. *Duty to Bargain.* Under the Railway Labor Act, employers and Unions have a duty to bargain in good faith over "rates of pay, rules and working conditions." 45 U.S.C. §§ 152, 155, 156; *Chicago & Northwestern Ry. Co. v. United Transportation Union,* 402 U.S. 570, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971); *Order of Railroad Telegraphers v. Chicago & Nw. Ry.,* 362 U.S. 330, 80 S.Ct. 761, 766, 4 L.Ed.2d 774 (1960). A "change in working conditions governed by the collective agreement ... [is] by definition ... a major dispute." *Brotherhood of Locomotive Engineers v. Burlington Northern,* 838 F.2d 1087, 1093 (9th Cir. 1988); *Order of Railroad Telegraphers,* 80 S.Ct. at 764–66; *United Industrial Workers v. Board of Trustees of Galveston Wharves,* 351 F.2d 183 (5th Cir.1965); 45 U.S.C. §§ 155, 156. Thus, if Southwest's drug testing program would effect a change in working conditions, Southwest must bargain over the content of the program in the major dispute process, unless the Union has waived its right to bargain.

The majority holds that implementation of the testing program would "effect[ ] a change in rules and working conditions" over which the employer has a duty to bargain. This dispute, then, is a major dispute by definition. Unless the Union has waived its right to bargain over the change in working conditions, this contest should be routed to the major dispute process.

Both the *en banc* majority and the panel opinion use the phrase "mandatory subject of bargaining" to describe the employer's duty to bargain over proposed changes in working conditions. It should be clear from the panel opinion and the *en banc* majority opinion that the term "mandatory" is a shorthand for the duty to bargain over a unilaterally attempted or proposed change in rates of pay, rules or working conditions under the RLA. As I have discussed, the duty to bargain under the RLA attaches to a change in rates of pay, rules and working conditions unless the parties' agreement properly provides otherwise.

See, e.g., *United Industrial Workers,* 351 F.2d 183; *see also, e.g., Order of Railway Telegraphers,* 80 S.Ct. at 764–67 (employer had duty to bargain about job preservation issue despite employer's contention that decision was not bargainable and was within management prerogative); *First National Maintenance,* 101 S.Ct. at 2585 n. 23 (rejecting application of the duty to bargain under the RLA to an NLRA dispute, citing *Order of Railroad Telegraphers,* 80 S.Ct. 761).

The distinction between mandatory and permissive subjects of bargaining is a concept confined to labor relations under the NLRA. Under the NLRA, employers have a duty to bargain only over mandatory subjects of bargaining. *See, e.g., First National Maintenance,* 101 S.Ct. at 2580–81 (employer that terminated contract with customer had duty to bargain only over effects of its decision to terminate and not the decision itself). An employer subject to the NLRA may choose to bargain over permissive subjects of bargaining, but is under no obligation to do so.

## IV. *Waiver and the Proper Decisionmaking Forum.*

The majority holds that Southwest has a duty to bargain because implementation of the program would "effect[ ] a change in rules and working conditions." Because this dispute is major by definition, the majority's *ratio decidendi* is that (1) the Union has arguably made a clear and unmistakable waiver of its right to bargain over changes in contractual terms where the contract is materially silent; (2) the contract is materially silent; and (3) the board of adjustment should decide whether the Union has arguably waived its bargaining rights. Thus raising the term "arguable" to talismanic status, the majority relentlessly Hubbardizes a clause that on its face allows mere interstitial rulemaking into an arguable zipper clause of global scope that cuts only in favor of Southwest. We may have to look at waiver through permanently scratched lenses after today.[22]

discern. *See, e.g., Murdock v. Memphis,* 87 U.S. (20 Wall.) 590, 22 L.Ed. 429 (1873).

**22.** For purposes of my discussion in this section, I assume that the contract is materially

No ambiguity suggests "arguable waiver" in this case. The panel was correct in determining the waiver issue as a question of law. In any event, the determination is reserved for a federal court, not an adjustment board. In this major dispute, the majority's holding concerning waiver is inconsistent with both the statutory scheme and controlling case authority.

The majority also states, amidst a cloud of dicta, that we need not decide whether waiver analysis applies to RLA cases. As I shall discuss below, waiver analysis is a generic rule of construction that certainly applies in RLA cases because there is no alternative except fiat.

We face one controlling question today: whether a federal court or a board of adjustment in these circumstances should decide if the Union has clearly and unmistakably waived its right to bargain. But an answer to the question requires a thorough understanding of the role of waiver in labor contracts because management rights clauses appear in almost every labor contract subject to both the RLA and the NLRA.

A. *What is a Zipper Clause?* Although the majority uses different phraseology, the majority holds that the Union has arguably bargained away a zipper clause to Southwest. The management rights clause in this case provides that

> Employees covered by this Agreement shall be governed by all Company rules, regulations and orders previously or hereafter issued by proper authorities of the Company which are not in conflict with the terms and conditions of this Agreement....

Management rights clauses are ubiquitous in labor contracts. A Bureau of National Affairs survey indicates that approximately 99% of all labor contracts contain management rights clauses.[23]

In this case, the majority holds that the Union has arguably waived its right to bargain although nothing in the parties' bargaining history suggests that the Union has waived its rights, and the language of the agreement states nothing specific concerning a waiver of the right to bargain. Absolutely nothing in the record below, apart from the language of the management rights clause itself, suggests waiver. The majority thus holds that unions subject to the RLA have arguably waived their statutory right to bargain in every dispute under the RLA involving a boilerplate management rights clause like this one when the contract is arguably silent in material respects. The majority's holding will sweep widely.[24]

Management rights clauses most commonly allow interstitial rulemaking. Unions are not interested in bargaining over day-to-day management decisions that do not change the conditions of employment in the bargaining unit. But in some cases, management rights clauses may also allow unilateral changes in working conditions by management during the life of the contract when the language of the clause or the parties' bargaining history demonstrates that the union has ceded the right to the employer. In the labor arena, these clauses are often termed "zipper clauses."

A zipper clause receives its name from the image of the self-contained bargain, where the contract contains everything the parties could possibly bargain over in the world, where nothing lies outside the scope of the contract, where neither contractual vacuum nor silence exists. The zipper clause contains all of the content of the

---

silent, although I demonstrate in Part V *infra* that it is not silent and the management rights clause should play no role in this case.

**23.** Donald P. Rothschild, Leroy S. Merrifield & Harry T. Edwards, *Collective Bargaining and Labor Arbitration* 501 (2d Ed.1979) ("BNA's survey of 400 out of 5,000 sample contracts kept on file indicate [sic] that all but 4 contained management (and union) rights provisions" (citation omitted)).

**24.** The majority's treatment of waiver is particularly disturbing because of the uncertain privacy rights of employees subject to collective bargaining agreements, particularly in the area of drug testing. *See Jackson,* 863 F.2d at 119; *Utility Workers,* 852 F.2d at 1086; *see* note 5 *supra; but see* Federal Aviation Administration drug testing regulations, 50 Fed.Reg. 47024 (Nov. 21, 1988); *Skinner,* —— U.S. ——, 109 S.Ct. 1402; note 3 *supra.*

parties' bargain that is not otherwise expressed or implied by past practice.

One may interpret a zipper clause in two ways. First, and most logically, a zipper clause may mean that neither party to the agreement may change rates of pay, rules or working conditions during the life of the agreement, unless the contract contains a specific reopener clause or reopener clauses, because express and implied terms solely guide the parties' conduct. *See United Automobile Workers v. NLRB,* 765 F.2d 175, 180 (D.C.Cir.1985) (Edwards, J.). More commonly, zipper clauses are interpreted to allow management to act unilaterally to change the conditions of employment. If the management rights clause in this case is a zipper clause, it would carry the latter meaning because it speaks in terms of discretionary management rulemaking.

B. *The Rule of Construction.* Deciding whether a Union has clearly and unmistakably waived its statutory bargaining rights in the form of a zipper clause involves the application of a straightforward rule of construction in contract analysis. The majority, for no substantive reason, decides that the rule of construction may not apply under the RLA: "the difference between the [NLRA and RLA] creates a "debatable matter of law" concerning whether waiver analysis even "applies in a case arising under the RLA."

The majority does not and could not reject waiver analysis as a rule of construction under the RLA. Waiver is a generic concept, and its evidentiary predicates have deep roots in the law. "A waiver is a voluntary and intentional relinquishment of a known right or conduct that warrants an inference of such a relinquishment." *FDIC v. Condit,* 861 F.2d 853, 857 (5th Cir.1988) (citations omitted); *see, e.g., St. Louis Electric Light & Power Co. v. Edison General Electric,* 64 F. 997, 1001 (Circuit Court, E.D.Mo.1894) ("It is elementary law that, to constitute a waiver, the party upon whom it operates must have full knowledge of all the essential or material facts ... and the party relying upon such waiver assumes the burden of proof as to

the knowledge of the party making the waiver"); *see also, e.g., Cordova v. Hood,* 84 U.S. (17 Wall.) 1, 21 L.Ed. 587, 589 (1873) ("Waiver is a thing of intention as well as of action").

In the labor context, voluntary relinquishment of the statutory right to bargain exists either in a contract's specific language or where the parties' bargaining history suggests that the parties discussed the subject and the Union "consciously yielded" its right to bargain over a proposed change in working conditions. *NL Industries, Inc.,* 220 N.L.R.B. 41, 43–44 (1975), *enforced,* 536 F.2d 786 (8th Cir. 1976). A union's waiver must be clear and unmistakable. *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *see also Lingle v. Norge Division of Magic Chef,* —— U.S. ——, 108 S.Ct. 1877, 1883 n. 9, 100 L.Ed.2d 410 (1988). In a sense, the phrase "clear and unmistakable" is superfluous because a waiver in any context must be unambiguously evidenced. The terms "clear and unmistakable" merely make emphatic the inherently strict requirements predicating any conclusion that a party has waived its rights.

Whether the decisionmaker is a federal court or an arbitral forum, someone has to decide if a union has bargained away, in the form of a zipper clause, its statutory right to bargain over proposed changes in working conditions where the contract is materially silent. Implicitly recognizing this in its holding, the majority does not offer an alternative to waiver analysis because no alternative exists. Major disputes arise from unilaterally attempted or proposed changes in working conditions. If a union has bargained away its statutory right to bargain over changes in working conditions, no major disputes may arise during the life of the contract concerning an employer's unilateral changes in working conditions when the contract is materially silent. Without waiver analysis as a rule of construction, one is left with fiat.

Even if it were possible that a coherent alternative to waiver analysis existed, there would be no reason to treat the RLA and

NLRA differently in deciding whether the Union has bargained away a zipper clause. It is true that NLRA principles do not apply uniformly to RLA disputes because the statutory schemes are different. *First National Maintenance*, 101 S.Ct. at 2585 n. 23. But the majority's flow of words points to no material distinction between the Acts that suggests the statutory right to bargain under the RLA is any more subject to waiver than the right to bargain under the NLRA.

The majority notes only general distinctions in the Acts that make no difference in this context. In fact, at least three RLA policies mandate the use of waiver analysis. First, both the content of and the animating spirits behind the two magna cartas of federal labor policy insure the right to bargain. 45 U.S.C. § 152, First; 28 U.S.C. § 158. Second, the statutory duty to bargain is at least as broad under the RLA as it is under the NLRA. *See, e.g., First National Maintenance*, 101 S.Ct. at 2585, n. 23; *see Rockwood & Co.*, 285 N.L. R.B. No. 138 (1987) (National Labor Relations Board held a drug and alcohol testing program a mandatory subject of bargaining under NLRA; opinion of Administrative Law Judge, adopted by Board, rejected employer's argument that Union had waived its right to bargain). And finally, although both statutes were passed to insure industrial peace, only the RLA, not the NLRA, contains a statutory "no-strike" policy. *Texas & N.O. R. Co. v. Brotherhood of Ry. & S.S. Clerks*, 281 U.S. 548, 50 S.Ct. 427, 432, 74 L.Ed. 1034 (1930) ("the major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes' "); *Buffalo Forge v. Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 3148, 49 L.Ed.2d 1022 (1976) (" '[T]here is no general federal anti-strike policy [under the NLRA]' " (quoting *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 225, 82 S.Ct. 1328, 1344, 8 L.Ed.2d 440 (Brennan, J., dissenting))). Yet the RLA

carefully preserves a party's ultimate access to its strike rights in major disputes. 45 U.S.C. §§ 155, 156, 160; *Elgin*, 325 U.S. at 723–24, 65 S.Ct. at 1289–90. Thus, we should be particularly wary in RLA cases of claims that a union has waived its already limited access to economic weapons.

C. *The Panel Properly Decided the Waiver Issue.* Waiver analysis must apply to RLA disputes. The majority's *ratio decidendi* appears in its holding that "we are not squarely presented at this time with the question of how the 'clear and unmistakable' rule applies to RLA cases [because even assuming it does] . . . the construction [of the management rights clause] proposed by Southwest satisfies the minimal burden of arguably being a clear and unmistakable waiver" of the Union's right to bargain.[25] According to the majority's reasoning, the Union's "arguable waiver" transforms a dispute that is by definition major into a so-called minor dispute appropriate for the arbitral forum.

The majority's holding is disturbing because it treats only casually the uncertain privacy rights of employees in an area of law riddled with waiver and preemption difficulties.[26] Moreover, the majority's holding fails to make explicit the severe consequences of sending this otherwise major dispute to the arbitral forum. The majority leaves it to the adjustment board to decide the fate of employee strike rights in an otherwise major dispute, thus at best temporarily denying and perhaps erasing the Union's access to economic weapons.

The majority's opinion contains three fatal analytical errors. It ignores the unambiguous facts of this case; it is inconsistent with the statutory scheme; and it is inconsistent with RLA case authority. The panel concluded correctly that the union has not waived anything, arguably or otherwise, and that this controversy should be routed to the major dispute process.

---

**25.** I reiterate that the management rights clause, whatever it means, only plays a role in this case if the contract is at least arguably silent in material respects. The majority assumes that the contract's material silence is "undeniable

fact." I assume *arguendo* that the contract is arguably silent.

**26.** *See* notes 5 and 24 *supra* and note 38 *infra; but see* note 3 *supra.*

1. *Question of Law.* The "arguably justified" standard concerns the relationship between the content of contractual terms and a party's disputed act. The standard should not apply to questions of law that are brought to bear on the terms of the contract in an otherwise major dispute. A federal court should determine in the first instance whether a party has waived its statutory bargaining rights under the RLA.

The majority's holding conflicts with the statutory scheme. As I have discussed, the RLA provides for two types of dispute resolution. Disputes over proposed changes in working conditions are major disputes—the types of disputes from which strikes ordinarily result. Major disputes are subject to a complex mediation process, at the end of which the parties may resort to their economic weapons. Minor disputes are often grievances, and concern the proper application or interpretation of agreements. Boards of adjustment decide minor disputes. Parties may not resort to the use of economic weapons in minor disputes.

When a party contests which type of dispute the employer and union confront, the party may sue for an injunction in federal court, invoking the federal question jurisdiction of 28 U.S.C. § 1331, to preserve the status quo if the court determines that the dispute is major.[27] After analyzing the parties' contentions, the federal court routes the dispute to one of the two channels of dispute resolution.

The majority improperly places in an adjustment board the power to determine whether a union has waived its right to bargain (and ultimately its access to economic weapons) over an issue that is by definition a major dispute. The majority's holding gives one channel of the dispute resolution process (the adjustment board) the power to decide whether the alternative channel (the Mediation Board process that may ultimately lead to use of economic weapons) is the appropriate forum for dispute resolution. But federal courts, not

adjustment boards, are at the apex of the triangle in contested forum cases because unlike adjustment boards, federal courts are relative strangers to the actual dispute resolution process.

The federal interest in ensuring the proper relationship between courts and arbitrators further demonstrates the majority's error. A court sends a signal concerning the merits of an already determined major dispute when it routes the dispute to an adjustment board, which decides minor disputes, to determine whether a union has waived its right to bargain. As the Supreme Court has noted in an analogous context, "[I]t is difficult to believe that the arbitrator would not be heavily influenced or wholly preempted by judicial views...." *Buffalo Forge*, 96 S.Ct. at 3150.

The "judicial influence" argument may appear to prove too much. It does not. Although courts send disputes to adjustment boards as "minor," which may imply judicial views on the merits, the difference between such common cases and this case is that minor disputes *belong* before an adjustment board. The adjustment board may correct judicial error in characterizing a dispute as "minor" by nevertheless concluding that a duty to bargain exists because the proposed issue or contested unilateral act constitutes a change in rates of pay, rules or working conditions. In contrast, the majority in this case has already concluded as a matter of law that the dispute is major absent waiver of the right to bargain. The most that the adjustment board may do is ratify the majority's legal conclusion.

2. *No Ambiguity.* Even assuming the majority is correct in applying the "arguably justified" standard to waiver analysis, its application is incoherent in this case because no material evidence supports a finding of waiver, arguable or otherwise. Southwest's waiver argument, which depends solely on the language of the management rights clause, is not even colorable, much less arguable. Absolutely

---

**27.** In certain circumstances, an injunction may be appropriate in minor disputes. *See* note 38, *infra.*

nothing in the record, apart from the language of the management rights clause itself, supports a determination that the Union has even arguably waived its right to bargain. *See St. Louis, S.F. & T. Railway*, 328 F.2d at 753 ("arguable" means more than "merely fictitious" or even "colorable") (Tuttle, J.).

Ambiguity, not clarity or unmistakability, gives rise to arguability. Even assuming that a party may "arguably waive" a known right where the factual context offers conflicting or uncertain evidence, this case, as I have probably stated emphatically enough, involves nothing more than the language of a common management rights clause. Because we have been presented with the material information necessary to decide the question of law, we confront no potential ambiguity resulting from any evidence or contract language, and neither would an arbitrator. In this context, a board of adjustment would have no discretion to decide the issue differently from this court because both decisionmakers would be presented with identical, unambiguous information. Mother Hubbard cannot be arguably pregnant after application of an ultrasound test.

It is instructive to compare the language of the management rights clause in this case with the management rights clause rejected by the court in a controlling case in this circuit, *United Industrial Workers v. Board of Trustees*, 351 F.2d 183, 187 n. 18 (5th Cir.1965), and with the management rights clause rejected by the court in *Transport Workers Union v. SEPTA*, 863 F.2d 1110, 1124 (3d Cir.1988). I discuss both of these cases immediately below.[28]

3. *Case Authority.* The majority's cavalier approach to waiver not only conflicts with the statutory scheme, the facts of this case, and reasoned analysis, it is inconsistent with RLA authority both in this circuit and in the Third Circuit. The law of this circuit supports the Union's position, although the majority would have one believe that management prerogative is enshrined in our precedent. Failing to cite a controlling case, *United Industrial Workers*, 351 F.2d 183 (5th Cir.1965), the majority misplaces its reliance on *Railway Express Agency v. BRAC*, 437 F.2d 388 (5th Cir. 1971), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1972). The court in *United Industrial Workers* completely rejected a management rights argument in a case involving a management rights clause with language explicitly favoring employer discretion in the area at issue. *Railway Express Agency v. BRAC* is distinguishable because past practices, not the management rights clause, determined the result. In *Railway Express*, unlike in this case, the employer's unilateral act was arguably justified by prior union acquiescence.

In *United Industrial Workers*, 351 F.2d 183 (5th Cir.1965), a union served notice on a dock owner and operator that it wished to open an existing contract for negotiation concerning a grain elevator facility that employed the union's members. On the same day, the employer advised the union that it would not negotiate, "presumably" because it had leased the elevator facility to a third party, and posted a notice that all employees would be permanently laid off. 351 F.2d at 185. The court, in an opinion by Judge Brown, held that the dispute was major and that the employer had to bargain before it could put the lease into effect.

The court rejected all of the employer's arguments that the contract's terms made the dispute a minor one. In particular, the court rejected the employer's management rights argument. 351 F.2d at 189. The contract's broad management rights clause provided that "The management of the [grain] elevator and the direction of the working force, including, but not limited to the right to ... increase and decrease the

---

**28.** I note that it is not difficult for two parties, bargaining at arm's length, to include an unambiguous zipper clause in their contract stating, for example, that "The Union has waived its right to bargain over changes in rates of pay, rules and working conditions unless a change would conflict with an existing express or implied term of the agreement." If an employer wishes to exercise such unfettered discretion, an employer should insist on such language during bargaining.

working force ... are vested exclusively in the carrier." 351 F.2d at 187 n. 18.

The court in *United Industrial Workers* did not infer waiver, arguable or otherwise, even when the language of the management rights clause might appear to have given rise to an arguable issue. The *United Industrial Workers* court rejected a clause that on its face gave management the right to decrease the workforce in a case that *concerned* layoffs. The clause in this case is quite less specific than the unspecific management rights clause in *United Industrial Workers*. In addition, the *United Industrial Workers* court emphasized that an employer's duty to bargain is extremely broad in the RLA context, relying on *Order of Railroad Telegraphers*, 362 U.S. 330, 80 S.Ct. 761. 351 F.2d at 191.

On a second appeal in the same case, another panel of this circuit emphatically noted the import of the panel's holding on the first appeal: "[T]he [carrier's] assignment of error in its cross appeal ... bearing on the construction to be given the 'management rights clause' of the bargaining agreement, is without merit. The district court correctly rejected this as irrelevant in view of this Court's prior opinion." *United Industrial Workers*, 368 F.2d 412, 414 (5th Cir.1966).

The majority's reliance on *Railway Express Agency v. BRAC*, 437 F.2d 388 (5th Cir.1971), is misplaced because the decision was controlled by prior union acquiescence in unilateral employer work transfers. In *Railway Express*, the employer unilaterally contracted out to an airline a portion of the employer's air express transfer work that the employees had previously handled at an airport. 437 F.2d at 390. The local union challenged the act, contending that it violated the parties' collective bargaining agreement. The court held that the dispute was minor and routed the dispute to the arbitral forum.

As the majority correctly states, Judge Bell's opinion for the panel cites the management rights clause in the collective bargaining agreement. The clause reserved "the right of management to determine methods of operation and the utilization of the working forces...." 437 F.2d at 392. But the decision did not result from a holding that the clause constituted an arguable waiver of the right to bargain.

The result in *Railway Express* was controlled by a "state of facts," not by the agreement's management rights clause. *Id.* In *Railway Express*, "there [was] an undisputed work history of such unilateral transfers of work with no apparent objection from the union." *Id.* In other words, the past practices of the parties controlled the result. The Union had acquiesced in the types of work transfers giving rise to the dispute. Furthermore, the certified bargaining agent was BRAC (the International), which agreed that the dispute was minor and wired the local that the strikers should return to work immediately. *Id.* at 393.

In this case, the Union has not acquiesced in the intrusive and unprecedented enforcement methodology constituted by the drug testing program. Unlike in *Railway Express*, no "state of facts" in this case suggests that unilateral implementation of the testing program gives rise to a minor dispute, arguably justified by past practice or any other term of the contract.

The majority states that the *Railway Express* court "relied heavily" on the Second Circuit's decision in *Rutland Railway Corp. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21 (2d Cir.1962), and the majority quotes the *Rutland* decision at length. *Rutland* is inapposite for two reasons. As I have demonstrated, a "state of facts" controlled the court's decision in *Railway Express*. 437 F.2d at 392. Even if *Rutland* supported the type of Mother Hubbard argument that the majority makes in this case, it would not be persuasive in this circuit because *Railway Express* was controlled by prior union acquiescence, and *United Industrial Workers*, 351 F.2d 183, 368 F.2d 412, is the controlling law in this circuit.

*Rutland* does not support the majority's argument in any event. *Rutland* includes broad language concerning management

prerogative, but does not engage in Hubbardizing. *Rutland* involved an employer's unilateral attempt to make changes on train runs. The court held that the dispute was minor because several specific provisions concerning train runs, 307 F.2d at 35–36, and the "prior conduct of the parties," *id.* at 36, arguably justified the employer's unilateral act. Unlike in this case, the contract in *Rutland* required arbitral interpretation.

The majority's decision also clashes with the law of the Third Circuit, which explicitly has rejected a Mother Hubbard argument in a drug testing case, the material portion of which is similar to the case the majority decides today. *Transport Workers Union v. SEPTA*, 863 F.2d 1110, 1122–24 (3d Cir.1988). In *Transport Workers*, the employer relied on the language of a management rights clause in an attempt to justify its unilateral implementation of a drug testing program. The clause provided that the employer retained "'all management functions and responsibilities which SEPTA has not expressly modified or restricted by a specific provision of this Agreement.'" *Id.* at 1124. The court rejected the employer's argument "that it reserved its right to modify its drug testing policies through [the] 'management functions' clause," holding that "such broad management rights clauses cannot serve to exempt management from the RLA prohibition against unilateral institution of changes in rules and working conditions." *Id.* Unlike the majority, the Third Circuit does not believe that unspecific language in a management rights clause supports even a colorable contention that a union arguably has made a clear and unmistakable waiver of its right to bargain.[29]

D. *Summary.* Implementation of the testing program, as the majority holds, would "effect[ ] a change in rules and working conditions." This is therefore a major dispute. The panel correctly determined that the Union did not waive its statutory right to bargain, and correctly held that this contest should be routed to the major dispute process.

Waiver analysis must apply in RLA disputes. Whether a Union has waived its statutory right to bargain is a question of law for a federal court, not a board of adjustment. Even if the "arguably justified" standard applies to waiver issues, there is no waiver in this case, arguable or otherwise, as a matter of law, because absolutely nothing in the record below suggests waiver. Not least important, the majority's opinion both ignores controlling law of this circuit and is inconsistent with the law of the Third Circuit.

Because the Union has not even arguably waived its statutory right to bargain over the program, this contest should be subject to the procedures mandated by 45 U.S.C. §§ 155, 156, 160. In the major dispute process, a union has a right to bargain in the context of a judicially-enforced status quo. If the parties reach impasse and the President does not intervene, 45 U.S.C. § 160, they may resort to their economic weapons without fear of a federal court injunction. *Burlington Northern*, 481 U.S. at 445–53, 107 S.Ct. at 1851–55, 95 L.Ed.2d at 398–403.

## V. *The Management Rights Clause Does Not Control This Case.*

### A.

Waiver analysis plays no role in this case if the management rights clause does not apply by its own terms. The clause does not apply if a unilaterally promulgated "rule, regulation or order" is "in conflict with the terms and conditions of [the] Agreement." That is, the clause only applies, whatever it means, if the contract is materially silent. The contract is not materially silent, although I have assumed it is silent in Part IV *supra* to respond to the majority's holding in this case.

---

**29.** *See also Transport Workers v. Eastern Airlines*, 695 F.2d 668, 673 n. 3 (2d Cir.1982) (Newman, J.) (criticizing the RLA's major/minor dispute scheme as not "entirely satisfactory, particularly when courts are interpreting agreements that include general management rights clauses, which arguably can be enlisted to support any action taken by management that is not explicitly in conflict with a contractual right of the union" (citations omitted)).

The majority states that "the following facts cannot be denied:" (1) the testing program is a rule, regulation or order within the clause's meaning; and (2) the program does not conflict with the terms of the contract. Neither of the majority's interpretations is a fact, although I agree that the testing program is at least arguably a rule, regulation or order within the clause's meaning.

I deny that the testing program does not conflict with the terms of the contract. And even if the majority stated that the management rights clause applies because the program "arguably" does not conflict with the terms of the contract, the majority would be in error. The methodology of blood alcohol testing and urinalysis used to enforce the testing program's policy squarely conflicts with the contract's existing enforcement methodology of visual observation.[30] Under the parties' bargain, the employees enjoy (1) contractually protected privacy expectations that they will not become the subjects of discipline absent individualized suspicion; (2) contractually protected expectations of bodily and informational privacy; and (3) contractually protected expectations that they will not suffer unwarranted discipline such as wrongful discharge as a result of erroneous enforcement, or defamation resulting from dissemination of inaccurate test results. The testing program's methodology conflicts with the contract because it violates all of these expectations. The program allows Southwest to puncture any company employee's skin, and/or fully observe any employee, male or female, urinate after any accident at Southwest's absolute discretion, regardless of the employee's relationship to the accident. Nothing in the contract remotely justifies such methods of policy enforcement.[31]

The Union has waived nothing, assuming that the management rights clause applies and the contract is materially silent. *See* Part IV *supra.* But the contract is not silent. Methods of enforcement matter. If the method of visual observation, on the one hand, and blood alcohol testing and urinalysis, on the other, were entirely unrelated, silence might play a role in this case. Both types of enforcement methods, however, serve the same purpose: prevention of drug and alcohol abuse in the workplace. Moreover, the methods are integrally related for another reason: Southwest's testing program *includes* visual observation as one of its elements. Yet the majority states nothing substantive about the radically differing contents of the methods.

Treating all enforcement methodologies as fungible, the majority fails to make the type of threshold inquiry that controlled the panel's decision in this case and has controlled similar cases in the Third, Eighth and Ninth Circuits:[32] has the Union arguably acquiesced in the methods of a testing program that (a) is not limited to particularized suspicion; (b) invades bodily privacy interests; (c) invades informational privacy interests; and (d) invades interests in avoiding unwarranted discipline and potential damage to reputation?

If the differences between the methodologies of blood alcohol testing and urinalysis, on the one hand, and visual observation, on the other, were even arguably fungible, the majority would not have to rely

30. For explanation of the phrase "visual observation," see note 7 *supra.*

31. As I state above in note 3, the Federal Aviation Administration drug testing regulations, 50 Fed.Reg. 47024 (Nov. 21, 1988) are extensive and will undoubtedly remove some aspects of Southwest's program from the bargaining table, if the parties reach it. Some aspects of the program would remain negotiable, however, and therefore the FAA regulations, even assuming they are entirely constitutional, *see Skinner,* —— U.S. ——, 109 S.Ct. 1402, do not moot this case. Because the FAA regulations are not material in these circumstances to determining under the contract and the RLA the bargaining rights of the parties, they are not material to our immediate inquiry.

32. *Transport Workers Union v. SEPTA,* 863 F.2d 1110, 1122–24 (3d Cir.1988); *Brotherhood of Locomotive Engineers v. Burlington Northern,* 838 F.2d 1102, 1105–07 (9th Cir.1988); *Brotherhood of Locomotive Engineers,* 838 F.2d 1087, 1092–93 (9th Cir.1988), *cert. pending,* 57 U.S.L.W. 3017 (July 19, 1988); *Brotherhood of Maintenance of Way Employees v. Burlington Northern,* 802 F.2d 1016, 1022–25 (8th Cir.1986). The majority does not mention even one of these cases.

on the management rights clause to reach its result. The majority could rely solely on the Union's prior acquiescence in the visual observation methodology to hold that the contract arguably justifies Union acquiescence in blood alcohol testing and urinalysis. Because the majority relies on the management rights clause for its holding, the majority implicitly admits the obvious: acquiescence in an enforcement methodology of visual observation says nothing about acquiescence in an enforcement methodology of urinalysis and blood alcohol testing.

The district court found that Rule G is the contract's drug and alcohol policy, and that visual observation is the parties' contemplated method of Rule G enforcement under the contract. In two statements, the majority confuses policy and methodology, and ignores that methodological differences may give rise to a conflict. First, the majority states that "the testing program is more extensive than Rule G." Rule G is simply a policy, and the testing program contains both a new policy *and* an unprecedented enforcement methodology. Second, the majority states that Rule G's existence "demonstrates a history under the agreement of unilaterally promulgating *rules supporting* a drug and alcohol policy" (emphasis added). Policies are contained in rules, not in the air.[33] And if by "rules" the majority means methods of enforcement, then the Union's sensible acquiescence in Rule G should suffice to decide this case under the majority's approach. As I have stated, however, the majority implicitly admits that methodological dif-

ferences matter by basing its holding on the management rights clause.[34]

### B.

Methodologies may conflict because employee expectations are substantively part of the contractual terms *creating* the expectations. When the terms change because of unilateral employer actions, such employee expectations are violated.

Collective bargaining between these parties has resulted in a nonintrusive drug and alcohol enforcement method of visual observation because the Union has acquiesced in the method of visual observation through past practices. The contractual existence of the visual observation methodology creates (1) baseline contractual expectations that an employee will only be subject to discipline for violating a drug and alcohol policy when he or she is the focus of individualized suspicion; (2) baseline contractual expectations of bodily and informational privacy; and (3) baseline contractual expectations that employees will not be subject to unwarranted discipline, such as wrongful discharge, or defamation, for errors resulting from the enforcement of a drug and alcohol policy (visual observation is relatively error-free).[35] Because blood alcohol testing and urinalysis violate all of these contractually-protected expectations, the testing program's methodology conflicts with existing contractual terms and the management rights clause should play no role in this case.

I emphasize that we are in this case considering only the right to bargain. If the parties reach the bargaining table, the

---

33. Cf. *Palsgraf v. Long Island Railroad,* 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, J.) ("'Proof of negligence in the air, so to speak, will not do,'" quoting Pollock, Torts, p. 455 [11th Ed.]), quoted in R. Epstein, C. Gregory, H. Kalven, *Cases and Materials on Torts* 323 (4th ed.).

34. If Rule G and the method of visual observation arguably justify unilateral implementation of the testing program, then implementation of the program, it would seem, would at best arguably effect a change in rules and working conditions within the meaning of 45 U.S.C. §§ 155, 156.

35. I do not suggest that employees' contractual expectations of privacy, which result from the bargaining between their employer and representative, should supplant or alter the scope of employees' common law privacy rights, statutory privacy rights, and any applicable state or federal constitutional privacy rights. As I note above and below, however, *see* notes 5, 24 and 38, in the view of some courts, the only privacy rights that unionized employees may have, at least in the drug testing arena, may be contained in the collective bargaining agreements to which the employees are subject. *Jackson,* 863 F.2d at 119; *Utility Workers,* 852 F.2d at 1086. *See also* note 3 *supra.*

Union may agree in bargaining to the stringent enforcement techniques. But it may at the same time urge the narrowing of coverage or perhaps specific safeguards as to the quality of the laboratory work or the confidentiality of the test results. The point is, in all of this discussion in this entire case, we are considering only the rights of the employees to be heard through their Union by bargaining about these complicated issues.

1. *Individualized Suspicion.* Under the parties' agreement, employees have been subject to discipline for violating a drug and alcohol policy only when they have been particularly suspected of wrong-doing.[36] Southwest's testing program, if implemented, would dramatically upset the employees' contractually protected privacy expectations concerning individualized suspicion. The program allows the company to puncture the skin and/or observe the urination of any company employee after any vehicular accident at Southwest's discretion, regardless of the employee's relationship to the accident. Under the terms of Southwest's testing program, if two mechanics collide while driving maintenance vehicles, a ticketing agent could be subjected to the program's testing methods without any basis for suspicion.

Every other court addressing the issue we face, in a Rule G or similar enforcement context, has determined that the issue of an employee's contractual privacy interest in individualized suspicion is a critical factor in deciding the outcome of a major/minor dispute issue under a collective bargaining agreement. The majority does not cite one of these decisions, much less attempt to distinguish them. *Transport Workers Union,* 863 F.2d at 1122–24 (unilateral implementation of random drug testing changes the terms of a contract, and is therefore a major dispute, when employees had acquiesced in drug testing only on reasonable suspicion); *BLE v. Burlington Northern,* 838 F.2d at 1105–07 (unilateral attempt to impose random canine sniffs constituted a major dispute be-

cause agreement, like the one in this case, required individualized suspicion in the form of "objective facts demonstrating prior use"); *BLE v. Burlington Northern,* 838 F.2d at 1092 (unilateral attempt to impose post-incident testing of entire train crew gave rise to major dispute when agreement had required individualized suspicion); *Brotherhood of Maintenance of Way Employees v. Burlington Northern,* 802 F.2d at 1023 (Arnold, J., for a unanimous court on the issue) (unilateral attempt to impose post-incident testing of train crews gave rise to a minor dispute, but in part only because employer's policy limited testing to individuals who could have been responsible for the accident).

The analytical framework applied in these cases should control this contest. As the panel opinion demonstrated, this case involves prior acquiescence in policy enforcement only when suspicion is individualized—which is inherent in the very methodology of visual observation. Southwest's program sweeps more widely than anything the Third, Eighth and Ninth Circuits have permitted in similar cases. The conflict between the enforcement methods in this case, resulting from the differences in requisite suspicion, alone makes the management rights clause inapplicable and the arbitral forum inappropriate.

2. *Contractual Privacy Interests.* The majority also ignores the importance of employees' contractually protected expectations of privacy. Privacy interests, which inhere in the contract's enforcement methodology term, take two forms: bodily privacy and informational privacy. Blood alcohol testing and urinalysis conflict with the contract because they violate the expectations created by the minimally intrusive methodology of visual observation.

(a) *Bodily Privacy.* Blood alcohol testing and urinalysis implicate two distinct but related interests in bodily privacy.

i. *Urinalysis.* Supervisors must directly witness the act of urination to prevent

---

**36.** There is no history of Rule G enforcement in this case because there is no history of drug or alcohol abuse among the Union's members.

the substitution of fraudulent urine samples.[37] Southwest's program gives the company absolute discretion to utilize this effective method.

Urination with a witness is, one might say, inconsistent with the traditional elimination of urine as a solitary activity. "There are few activities in our society more personal or private than the passing of urine." *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir.1987) (Rubin, J.), *affirmed in part and reversed in part,* — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). "In our culture the excretory functions are shielded by more or less absolute privacy...." Charles Fried, *Privacy*, 77 Yale L.J. 475, 487 (1968); *Skinner,* — U.S. at —, 109 S.Ct. at 1413. Needless to say, supervisorial witnessing of urination conflicts with the method of visual observation of employee behavior in the workplace, which is the existing method of policy enforcement under the contract.

ii. *Blood Testing.* Blood alcohol testing requires the literal violation of the body. Puncturing flesh in search of blood violates the contractually protected privacy expectation created by the nonintrusive methodology of visual observation. In the constitutional context, the Supreme Court has well-recognized the serious intrusions occasioned by blood testing. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Skinner,* — U.S. at —, 109 S.Ct. 1412. Blood testing does not become any less invasive when, if imposed unilaterally, it violates the terms of a collective bargaining agreement.

(b) *Informational Privacy.* The employees also have a legitimate contractual privacy interest in not disclosing private medical information, in the form of a blood or urine sample, to which an employer is not otherwise entitled. The method of visual observation creates and guarantees this contractual privacy expectation. Blood al-

cohol testing and urinalysis fundamentally conflict with employees' protected interests in nondisclosure of private medical information.

An employer testing only for the presence of intoxicants has no legitimate interest in knowing, for example, whether an employee is pregnant, epileptic, diabetic or clinically depressed. Blood and urine samples contain such information. *Skinner,* — U.S. at —, 109 S.Ct. at 1413; *id.* at —, 109 S.Ct. at 1429 (Marshall, J., dissenting); *see* Comment, *Meeting the Challenge to Privacy Rights by Employer Drug Testing: The Right of Nondisclosure,* 1988 U.Chi.Legal F. 213. Southwest's program gives the departmental Vice Presidents absolute discretionary access to all information contained in test results. Unlike blood alcohol testing and urinalysis, visual observation as a method of enforcement does not tread on any such informational privacy interest.

3. *Unwarranted Discipline and Defamation.* Southwest's testing program provides for punishment up to and including discharge for violations of the program's policy. The employees have a contractually protected interest in avoiding unwarranted discipline, such as wrongful discharge, and potential defamation caused by the dissemination of inaccurate test results. Supervisorial visual observation is relatively error-free because of the individualization and immediacy of the scrutiny. *See* note 7 *supra.* In contrast, urinalysis, at least, "inherently ha[s] some rate of inaccuracy." Elaine Shoben, *Test Defamation in the Workplace,* 1988 U.Chi.Legal F. 181, 182, *citing,* Council on Scientific Affairs in Scientific Issues in Drug Testing, 257 Journal of the American Medical Association 3110 (1987). Both blood alcohol testing and urinalysis may result in errors leading to discipline because of faulty chains of custody and incompetent or erroneous laboratory analysis. These problems are not merely theoretical. *Shoben, Test Def-*

---

**37.** *See Skinner,* — U.S. — n. 8, 109 S.Ct. at 1428 n. 8 (Marshall, J., dissenting), quoting the Federal Railroad Administration regulations at 50 Fed.Reg. 31555 (1985) ("observation is the most effective means of ensuring that the sample is that of the employee and has not been

diluted"); *id.* at —, 109 S.Ct. at 1428 (citing an FRA Field Manual instructing supervisors monitoring urination that "railroad workers must provide urine samples *under direct observation* by the physician/technician" (emphasis in Justice Marshall's opinion)).

*amation,* 1988 U.Chi.Legal F. at 183 nn. 11 and 12. And leaks of inaccurate confidential information may result in severe reputational damage. *See generally id.*

Southwest's testing program implicates all of the problems associated with blood alcohol testing and urinalysis. Moreover, the program gives Southwest absolute discretion to determine the laboratories to be used; the chain of custody procedures; and the procedures to ensure confidentiality. Thus, in addition to the inherent problems in the methodology, nothing in the program guarantees that Southwest will accurately determine the appropriate levels of care in determining whether and how to minimize such errors. See note 13 *supra,* concerning the problems of laboratory incompetence and faulty chains of custody.

### C.

The bargain between Southwest and the Union does not arguably justify such sweeping changes in the conditions of the workaday world. The employees, through their Union, contracted for significantly more protection by acquiescing in Rule G and its enforcement method of visual observation. The testing program irreconcilably conflicts with the contract because its enforcement methods violently upset employees' contractually protected expectations. Because the management rights clause should not control this case, the board of adjustment is not the proper forum to resolve any aspect of this dispute.

The majority routes this dispute to the board of adjustment, which may determine that the Union has not waived its right to bargain. Southwest may have to bargain over the terms of this program after all. I certainly hope this correct result is ultimately reached, one way or another. If Southwest's testing regime were implemented as it stands, employees would labor away in their workaday world, well-aware of Southwest's far-reaching discretion. Employees would be particularly well-aware of the invasions of privacy and unwarranted discipline to which the exercise of Southwest's discretion could lead under the program. The majority rewrites the parties' bargain, and denies—temporarily at least—the Union's right to bargain in a major dispute. Even a temporary denial of the right to bargain, however, is not justified by the parties' contract or the Railway Labor Act.[38]

### Conclusion

In this intricately structured arena of labor relations, the need for lengthy discus-

---

**38.** This is clearly a major dispute, and the Union has not waived anything, arguably or otherwise. As a consequence, we should affirm the district court's status quo injunction pending the completion of the mediation process. 45 U.S.C. §§ 155, 156, 160.

Because this contest should be routed to the major dispute process, I shall not fully discuss the majority's holding that the district court abused its discretion by enjoining the testing program, under the district court's alternative assumption that this is a minor dispute. I note, however, that injunctions may be appropriate in minor disputes "to prevent the carrier from disrupting the status quo when doing so would result in irreparable injury of a magnitude that would render a decision in favor of the union[ ] virtually meaningless." *International Association of Machinists v. Frontier Airlines,* 664 F.2d 538, 542 (5th Cir.1981). Cf. *United Steelworkers v. United States Steel,* 1989 WL30697, 1989 U.S. Dist. LEXIS 3246 (March 29, 1989) (preliminarily enjoining implementation of a drug testing program).

Potentially irreparable injuries to employees could result from unilateral implementation of the testing program pending arbitration, partic-

ularly if the adjustment board ultimately determines that the Union has a right to bargain over the program's terms. Such potential injuries could take the form of invasions of privacy, wrongful discharge or defamation resulting from dissemination of inaccurate test results.

State tort claims for injuries caused by an employer pending arbitration, where the Union has not spoken under the contract, may not be fully remediable under the contract and Railway Labor Act because the claims may be preempted. *Andrews v. Louisville & Nashville Railroad Company,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); *Magnuson v. Burlington Northern,* 576 F.2d 1367 (9th Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). At least when the Union has bargained over the program's terms, the employees receive some contractual protections—or something else in return for bargaining away privacy protection under the contract—to replace (in theory) the loss of state law rights. Cf. *Utility Workers,* 852 F.2d at 1086; *Jackson,* 863 F.2d at 119. Thus, whether the district court abused its discretion is an exceedingly complicated question that the majority fails to address adequately. *But see* note 3 *supra.*

sion has surely become apparent. Still, "a few words will suffice to relate my essential discovery.... So here goes." [39]

This case concerns neither the wisdom nor propriety of drug testing. Moreover, this case does not concern the relationship between employee privacy rights and employer or social interests in safety, efficiency or property. This case simply concerns whether, in these circumstances, the Union's members have a voice under the parties' agreement.

As the panel held, and as the majority holds, implementation of the testing program would "effect[ ] a change in rules and working conditions." In this major dispute, the Union has waived nothing, arguably or otherwise, in the form of a zipper clause. Because the majority's Hubbardizing is inappropriate, and because the board of adjustment has no proper role to play in this contest, I dissent.

ALVIN B. RUBIN, Circuit Judge, dissenting:

The case presented to the district court is now moot. The collective bargaining agreement between the parties, which served as the sole basis for the suit and the injunction, has expired. Even though the injunction issued by the district court is not expressly limited to the period during which the agreement was in force, the only basis for it was, as the majority opinion notes, that "the implementation of the program was not arguably justified under the terms of the collective bargaining agreement." Once the agreement had ended there was no predicate for enjoining management action, and the injunction could no longer be enforced.

The sole basis then on which a federal court might continue to assert jurisdiction is that the parties have now negotiated a new agreement and, in order to secure a judicial opinion, have failed to clarify the terms of their contract or even, we were informed in oral argument, to bargain in an

attempt to do so. Instead, they ask us to interpret the new contract, saying, in effect, "we would like to put before you some contract language about which we do not wish to negotiate and have you tell us what it means." We should not allow ourselves, sitting en banc, thus to be drawn into a dispute calculatedly kept alive solely so that we could resolve it.

The majority concedes that the original dispute is indeed moot, but justifies asserting jurisdiction on the ground that the dispute is capable of repetition yet evading review. Judge Goldberg's dissent also adopts that view. I cannot agree. Any contract that has expired may be repeated; that is no reason to interpret contracts that are no longer in effect. I am unable to understand, furthermore, how a dispute that has actually been repeated, and that could be reviewed by the simple expedient of applying for an injunction based on the current contract, could possibly be capable of repetition yet evading review. So long as a contract is not inherently short-lived, review is easily obtained, and, if it is inherently short-lived, ambiguities should, absent extraordinary circumstances, be clarified by the parties, not by the courts.

The majority concludes, however, that labor litigation is so different from other litigation that it mandates a different interpretation of the constitutional provision restricting judicial action to "cases and controversies." [1] I do not believe that labor litigation stands a constitutional world apart. The three cases relied on by the majority present questions entirely different from the issue sought to be kept alive here. They adopt completely conventional interpretations of the constitutional requirement, and do not justify asserting jurisdiction in this case.

In *Super Tire Engineering Company v. McCorkle*,[2] the first of these cases, New Jersey employers whose employees had struck sued for declaratory and injunctive relief to prohibit New Jersey officials from

---

**39.** Albert Camus, *The Fall* (1956) (Vintage Books, p. 69, tr. Justin O'Brien).

**1.** U.S. Constitution Art. III, § 2.

**2.** 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

paying welfare benefits to the strikers. Because the labor dispute that had given rise to the suit and the strike sought to be enjoined had both ended, the Court expressly held that the suit had become moot as to the request for injunctive relief.[3] The Court found, however, that a real controversy continued with respect to the request for declaratory relief. The court stated, "the challenged *governmental* activity ... [was] not contingent, ha[d] not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties."[4] Thus declaratory relief was appropriate because the non-contingent nature of the officials' action ensured that they would pay welfare benefits during the next strike, and the mere threat that this would occur substantially strengthened the employees' hand.

While the collective bargaining agreement involved in *Buffalo Forge v. United Steelworkers of America, AFL–CIO*[5] had ended when the case was heard, the question was whether issues arising under it were arbitrable, and the parties had stipulated that "the collective bargaining agreements *in effect when this action arose ... govern resolution of this dispute.*"[6] The issue then was the interpretation of the original agreement. "Furthermore," the Court stated, "were the issue arbitrated and the strike found illegal, the relevant federal statutes as construed in our cases would permit an injunction to enforce the arbitral decision."[7]

Reliance on *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*[8] is even more unwarranted, for in that case the collective bargaining agreement invoked had not terminated. A strike to protest the shipment of fertilizer to the Soviet Union had ended but, the Court noted, "[a]lthough the work stoppage is no longer in effect, there remains a live controversy over whether the collective-bargaining agreement prohibits politically motivated work stoppages, and the Union may resume such a work stoppage at any time."[9] This was the conclusion this circuit had earlier reached in the same case.[10]

In contrast, the issue between the union and the airline is unsettled only because the parties failed to resolve it by collective bargaining when their earlier agreement expired. Even if the Constitution did not forbid us to decide this controversy, which has continued only by the manipulation of the parties to the dispute, we should exercise our prudential prerogative to abstain because we ought not to allow ourselves to become an instrument in the parties' collective bargaining process.

If there is a question of exceptional importance for which the en banc procedure is reserved,[11] it is not the one decided by the majority opinion. It is, instead, whether we will permit the parties in this fashion to provoke a rehearing en banc by a 16–judge court. I would not allow them to do so, and would dismiss the appeal.

For these reasons I respectfully dissent.

---

**3.** 416 U.S. at 121, 94 S.Ct. at 1698.

**4.** 416 U.S. at 122, 94 S.Ct. at 1698 (emphasis added).

**5.** 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

**6.** 428 U.S. at 404 n. 8, 96 S.Ct. at 3146 n. 8 (emphasis added).

**7.** 428 U.S. at 407, 96 S.Ct. at 3147.

**8.** 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982).

**9.** 457 U.S. at 704 n. 1, 102 S.Ct. at 2676 n. 1.

**10.** *New Orleans Steamship Ass'n v. General Longshore Workers,* 626 F.2d 455 (5th Cir.1980), *aff'd* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982).

**11.** *See* Fed.R.App.P. 35.